**Willis Bruce AMOS et al.**

v.

**METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Tennessee.**

Supreme Court of Tennessee, at Nashville.

June 5, 2008 Session.

Aug. 15, 2008.

---

706

C. Dewey Branstetter, Jr., Michael J. Wall, and David L. Raybin, Nashville, Ten-

nessee, for the appellants, Willis Bruce Amos et al.

Sue Boyd Cain, James L. Charles, Lora B. Fox, and Matthew J. Sweeney, Nashville, Tennessee, for the appellee, the Metropolitan Government of Nashville and Davidson County, Tennessee.

## OPINION

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.

Willis Bruce Amos and fifteen other individuals, each of whom was formerly employed in the police or fire departments of the Metropolitan Government of Nashville and Davidson County, filed suit, asking to have the lump-sum payments for unused vacation days paid at their retirement included in the formula determining the amount of their pension. Pursuant to applicable provisions of the Metro Code, the trial court granted a motion for summary judgment, holding that the lump-sum payments to Amos and the other individuals were not included in their "average earnings" for purposes of the calculations. The Court of Appeals upheld the judgment of the trial court. We affirm.

## I. Facts

Willis Bruce Amos and other former salaried employees (the "Plaintiffs") of the police and fire departments of the Metropolitan Government of Nashville and Davidson County ("Metro"), all of whom were entitled to compensation for unused vacation days at the termination of employment, filed a declaratory judgment action to determine the proper amounts of their respective pensions. Each had worked for Metro for more than twenty-five years. All retired after September 13, 2001, with the last retirement being June 1, 2002.

In compliance with an executive order, Metro has traditionally paid its salaried employees on a semimonthly basis: on the 22nd of each month for work performed from the 1st through the 15th of the month, and on the 7th of each month for work performed from the 16th through the last day of the month.[1] The terms of employment include an entitlement to twenty days of paid vacation per year of service. Unused vacation days may accrue over time to a maximum of sixty days.

Under applicable Metro Code provisions, a retiring or terminating employee may elect to receive payment for unused, accumulated vacation days in one of two ways. The first option is to remain on payroll as a Metro employee on "vacation" status until the unused vacation days are exhausted. A second method, which each of the Plaintiffs chose, is to receive a lump-sum payment based upon the rate of pay at the time of retirement; the total amount due depends on the number of unused vacation days. Sometime after their respective retirements, Metro paid all of the Plaintiffs for their accrued vacation pay.

1. Executive Order No. 42, effective Nov. 4, 1971, requires that regular salaries (no reference to lump-sums for accrued vacation time) be paid after the pay period is completed. It states, in pertinent part:

 Subject: Changing Semi–Monthly Payroll Dates so as to establish the practice of issuing paychecks following the pay period covered by such checks ...
 The practice of issuing paychecks to salaried employees semi-monthly has been long established for the Metropolitan Government and should be continued. However, the issuance of these checks on dates prior to the end of the pay period they are issued to cover is to be discontinued. Only by adjusting the date on which the payroll checks are to be issued to a time following the close of the pay period for which the checks are written can we be assured of the correctness and dependability of our payroll procedure and records.

From 1988 to 2000, when James Luther was the Executive Secretary to the Metro Benefit Board (the "Benefit Board"), that Board used annual W–2 income statements to compute "average earnings" and pensions. Pensions were based upon those earnings and the length of service of each employee. The pension ordinance required that "average earnings" be derived from a period of five calendar years preceding retirement.[2] Earnings included the total cash compensation, which included a regular rate of pay, overtime, shift differentials, and any benefit received by an employee that was in any way "remunerative." "Anything that [the employees] were paid that they ended up paying taxes on that [the Benefit Board] reported to the government, other than for reimbursement of expenses" were included in the pension calculations. Any vacation pay appearing on an employee's W–2 reports was also made a part of the formula.

Prior to Luther's term as the Executive Secretary, Metro employees had been required to exhaust their vacation days prior to retirement. In 1991 or 1992, however, Luther implemented a change in that policy, deciding that staying on the payroll until the accrued vacation time had ended was no longer necessary. Afterward, some employees requested and received from their respective departments their payment for unused vacation in their next-to-last paycheck on December 22, prior to their retirement on January 1 of the following year. If a lump-sum payment for accrued vacation was included in the W–2 statement, then it was used to compute earnings for pension purposes. If the payment was paid in a later year and not part of the W–2, then it was not included in the calculation. By deposition, Luther confirmed that during his tenure as secretary there was no uniformity amongst the various departments within the Metro government; rather, "[s]ome [departments] might do it one way [and] some, another." He did acknowledge that the Police and Fire Departments routinely granted requests for the lump-sum payments for accrued vacation time prior to the actual date of retirement, thereby increasing the amount of the pensions. Luther also stated that the pension ordinance did not address when the payment for accrued vacation was to be made, and that the decision was, therefore, left to the department head, payroll supervisor, and Director of Personnel.[3]

On September 13, 2001, some ten years after Luther's policy change, an attorney in the Metro Department of Law issued Legal Opinion 2001–03 to Metro's Finance Director and its Director of Personnel:

> The practice of paying vacation pay in a lump sum to a retiring employee *prior to termination* to increase pension benefits is not authorized. Until such time as this practice is appropriately authorized, it is the opinion of the Department of Law that it is unlawful and the Director of Finance has a duty to disallow such payments.

(Emphasis added). Pursuant to the opinion, the Director of Finance and the Director of Personnel[4] issued an October 31, 2001 memorandum instructing department heads not to issue lump-sum payments for unused vacation days to an employee until after the date of retirement. In consequence, each of the Plaintiffs received

---

**2.** The plan later changed to derive average earnings from a period of sixty (60) months prior to retirement rather than five calendar years.

**3.** Civil Service Rule 5.3 states, in pertinent part: "Employees shall be paid in accordance with the approved pay plan, Civil Service rules and policies, and policies established by the Director of Finance."

**4.** The record also includes references to the Director of Human Resources.

their lump-sum entitlement for unused vacation days subsequent to the conclusion of their employment. The amount was not used in calculating pensions.

On September 3, 2002, fifteen of the Plaintiffs filed suit against Metro and the Benefit Board, alleging that their lump-sum payments for unused vacation days should have been included in determining the amount of their pension benefits. Specifically, the Plaintiffs presented two claims: first, they sought a declaratory judgment that would set forth their rights as to the pension issue; and second, they alleged that the "irrational change in policy" as to the pension calculations had denied them their rights to equal protection. An amended complaint was filed in May of 2003, adding another police officer to the list of Plaintiffs. On February 11, 2004, the parties entered a Scheduling Order under which discovery was to be completed by July 31, 2004, so that the case could be tried in October of 2004. Approximately two months before the discovery deadline, the Plaintiffs filed a second motion to amend, seeking to add fifty-one other individuals as claimants; that motion, however, was never heard. Later, the parties agreed to dismiss the Benefit Board as a defendant. On July 22, 2004, the Plaintiffs filed a third motion to amend the complaint, asking for class action status; shortly thereafter, the trial court denied the motion on the grounds of potential delay in the trial.

Metro then filed a motion for summary judgment, and, in response, the Plaintiffs filed a motion for partial summary judgment on the issue of liability. After arguments, the trial court issued a memorandum and order granting summary judgment to Metro and denying the Plaintiffs' claims, holding that unused "vacation pay is not 'earnings,' as defined by the Metro Code for purposes of pension calculation." The trial court also denied a claim of estoppel, which the Plaintiffs based upon both the policy implemented during Luther's tenure and a 2002 statement by a representative of Metro's Benefit Board to the effect that unused vacation day payments would be included in the calculation of pension benefits.

On direct appeal, the Court of Appeals framed the issue as "whether the lump-sum payment is for 'personal services.'" The majority answered the question in the negative, denying relief to the Plaintiffs and holding that they "are receiving the lump-sum payment for their accrued vacation time, not for performing personal services." Our intermediate court upheld the trial court's denial of the estoppel claim and deemed as moot the class action issue. *Amos v. Metro. Gov't of Nashville & Davidson County, Tenn.*, No. M2005–00932–COA–R3–CV, 2007 WL 2254571, at *3, 2007 Tenn.App. LEXIS 505, at *7–9 (Tenn.Ct.App. Aug.2, 2007). Judge Frank Clement dissented. It was his opinion that the lump-sum payments for accrued vacation time qualified as compensation for personal services and ought "to be included in the calculation of ... [the] pension benefits." *Id.* 2007 WL 2254571, at **5-7, 2007 Tenn.App. LEXIS 505, at *16–17 (Clement, J., dissenting).[5]

We granted the Plaintiffs' application for review under Rule 11 of the Tennessee

**5.** The record indicates that at a retirement seminar in 2000, a representative of the Benefit Board stated that accrued vacation time payments would be included in the computation of pensions. In this appeal, the Plaintiffs have abandoned any theory of recovery on grounds of estoppel. Parenthetically, in *Bledsoe County v. McReynolds*, 703 S.W.2d 123 (Tenn.1985), this Court confirmed that as a general rule, the doctrine of estoppel does not apply to the acts of a public official or public agencies. *Id.* at 124. On the rare occasions estoppel has been applied against a municipality, there were exceptional circumstances—"the public body took affirmative action that clearly induced a private party to act

Rules of Appellate Procedure to determine: (1) whether the lump-sum payments for unused vacation days made at retirement were includable in the "average earnings" under the Metro Code; and, if so, (2) whether the trial court should have granted the motion to certify the claims as a class action. Tenn. R. Civ. P. 23.

## II. Standard of Review

 Our review is guided by a variety of well-established principles. "Initially, a trial court's grant of a motion for summary judgment presents a question of law that we review de novo without a presumption of correctness." *Lawrence County Educ. Ass'n v. Lawrence County Bd. of Educ.*, 244 S.W.3d 302, 309 (Tenn.2007) (citing *Goodloe v. State*, 36 S.W.3d 62, 65 (Tenn. 2001)). "Summary judgment should be granted only when there are no genuine issues of material fact and a judgment is warranted as a matter of law." *Id.* "The moving party has the burden of proving that its motion satisfies these requirements." *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995) (citing *Downen v. Allstate Ins. Co.*, 811 S.W.2d 523, 524 (Tenn. 1991)). The appellate court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in favor of the non-moving party. *Edwards v. Hallsdale–Powell Util. Dist.*, 115 S.W.3d 461, 464 (Tenn.2003).

 The disposition of this case further depends on an interpretation of Metro's Charter (the "Charter") and Code (the "Code"). While, as a policy matter, laws creating pensions are remedial in nature and, therefore, liberally construed in favor of pensioners, that maxim does not apply unless there are irreconcilable ambiguities.

*Wyckoff v. Bd. of Admin. of the Ret. Sys. of the City of Memphis*, 208 Tenn. 604, 348 S.W.2d 289, 290 (1961). Otherwise, the same rules of construction that apply to statutes apply to municipal legislation. *Hargrove v. Metro. Gov't of Nashville and Davidson County*, 154 S.W.3d 565, 567–68 (Tenn.Ct.App.2004). Our objective is to determine the purpose of an ordinance and permit its effect without restriction or expansion:

> The search for an ordinance's purpose begins with the words of the ordinance itself. If the ordinance is unambiguous, the courts need only enforce it as written. The courts must consider the ordinance as a whole and in doing so, must give the words in the ordinance their natural and ordinary meaning.
>
> . . . .
>
> [Courts] should avoid questioning the wisdom of the ordinance or substituting their own policy judgments for those of the local legislative body.

*Id.* at 568 (citations omitted). An interpretation of a statute or ordinance is a question of law, and, in consequence, this Court will review the issue de novo and reach our "own independent conclusion." *Id.*

## III. Analysis

### A. *Vacation Pay*

The Plaintiffs argue that they are entitled to include lump-sum payments for accrued vacation time received at retirement in the formula establishing their pensions. They contend that "[a] straightforward reading of the Charter, Code, and Civil Service Rules demonstrates that lump-sum vacation payments, as part of average earnings, should be included in the pension calculation." [6] For several reasons, we

---

to his or her detriment...." *Id.* at 125; *see, e.g., State ex rel Ammons v. City of Knoxville,* 33 Tenn.App. 622, 232 S.W.2d 564 (1950).

**6.** The responsibility for managing Metro's human resources is not vested in one department or agency, but has been shared by several departments, including the Employee Benefit Board, the Civil Service Commission,

conclude that the accrued vacation time payments should not be added directly to an employee's salary in his or her final year for the purpose of determining the average annual pay over the last sixty months of service.

Civil Service Rule 5.3 states that the "[e]mployees shall be paid in accordance with the approved pay plan, Civil Service rules and policies, and policies established by the Director of Finance." Civil Service Rule 5.13 provides that "[a]n employee whose services are being terminated, either voluntarily or involuntarily, shall be paid for all regular earnings due and accrued and vacation pay." Although these sections clearly provide that only terminating employees are entitled to payment for accrued vacation, they do not specify when the payment is due.[7] The Metro Code provides that a Metro police officer or firefighter is entitled to monthly retirement or termination benefits, which are determined by the following formula:

1. Two percent of *average earnings* for each year of credited fire and police service not in excess of twenty-five years; plus

the Department of Personnel, the Employees Relations Board, and the employing departments and agencies. Under the Metropolitan Charter section 13.06, the Metropolitan Council has the authority to enact a pension plan. The Benefit Board then has the duty to administer such plan in accordance with the ordinances enacted by the Metropolitan Council. Metro. Charter § 13.02. The Civil Service Commission is chiefly responsible for developing and fostering the effectiveness of Metro's personnel policies with regard to employees in the classified service.

7. Metropolitan Charter sections 8.210 and 8.308 dictate that employees of the Police and Fire Departments are entitled to twenty (20) vacation days per year. The Charter does not specify how or if such days are to be paid upon termination of employment. Section 8.210 states:

2. One and seventy-five one-hundredths percent of *average earnings* for each year that his credited police or fire service exceeds twenty five years.

Metro.Code § 3.37.020 (emphasis added). "Average earnings" is specifically defined as follows:

1. "Average earnings," when calculating pensions under Chapters ... 3.37 [dealing with policemen and firemen], means the arithmetic monthly average of a metropolitan employee's *earnings during* the period which contains the sixty consecutive months of credited service which produces the highest average.

Metro.Code § 3.080.010(1) (emphasis added). "Earnings" is further defined in the Code:

"Earnings" means from and after January 1, 1987, the *total cash compensation paid* by the metropolitan government or by a predecessor government to a metropolitan employee for his *personal services* excluding all sums in excess of amounts he would have received in his regular position if he is on a leave of absence from his regular position.

Metro.Code § 3.08.010(3) (emphasis added). Thus, the term "average earnings,"

Every member of the [police] department shall be entitled to two (2) days off each week and to an annual vacation of twenty (20) days without deduction of pay. The time for vacations shall be determined and assigned by the chief of police. All members of the department shall be subject to call and assignment to duty at any time during an emergency.

Section 8.308 states:

Every member of the [fire] department shall be entitled to two days off each week and to an annual vacation of twenty days without deduction of pay. The time for vacations shall be determined and assigned by the fire chief. All members of the department shall be subject to call and assignment duty at any time during an emergency.

as it is used in these sections, means the monthly average of an employee's "total cash compensation" paid by Metro for his personal services "during the period which contains the sixty consecutive months of credited service which produces the highest average." *See* Metro. Code § 3.080.010(1), (3).

### (1)

The Court of Appeals accurately determined that the Plaintiffs' lump-sum payments for accrued vacation qualified as compensation, see *Amos,* 2007 WL 2254571, at *3, 2007 Tenn.App. LEXIS 505, at *7, but also determined that the lump-sum payments for unused vacation days were "not for performing personal services." *Id.* 2007 WL 2254571, at *3, 2007 Tenn.App. LEXIS 505, at *8. We reach a different conclusion on the latter point. In our view, a lump-sum payment for vacation time is indeed compensation for personal services, and the amount of pay for any unused vacation time is a form of payment. This Court has previously held that an employee is "one who is employed by another and works for wages or salary." *Am. Sur. Co., v. City of Clarksville,* 204 Tenn. 67, 315 S.W.2d 509, 513 (1958); *see also Garner v. Reed,* 856 S.W.2d 698, 700 (Tenn.1993) (stating that an employee is hired to perform "services in exchange for compensation"). Our traditional view has been that vacation pay is a component of that compensation. *See Textile Workers Union of Am. v. Brookside Mills,* 203 Tenn. 71, 309 S.W.2d 371, 373 (1957)) ("[V]acation pay is in effect additional wages or compensation...."); *Gaines v. Response Graphics, Inc.,* No. 01–A–01–9204–CV–00181, 1992 WL 319441, at *1, 1992 Tenn.App. LEXIS 895, at *3–4 (Tenn.Ct.App. Nov.6, 1992) ("A paid vacation is a form of compensa-

tion.... Absent some agreement to the contrary, vacation pay is just like any other compensation that has accrued up to the time of separation."); *Weesner v. Elec. Power Bd. of Chattanooga,* 48 Tenn.App. 178, 344 S.W.2d 766, 768 (1961) ("Retirement rights are analogous to provisions fixing the rights [of] employees for paid vacations.... Both are inducements of the employment, both provide for the employees' well-being and peace of mind, which enures to the benefit of the employers."); *Black's Law Dictionary* 1610 (8th ed. 2004) ("Wages include every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, bonuses...."). In this case, therefore, the lump-sum payment was essentially deferred compensation for personal services. The Plaintiffs could have chosen a paid vacation, but instead elected to work and accept the pay at a later date.

### (2)

The real dispute, from our perspective, is whether the timing of those particular payments for personal services permits them to be counted toward average earnings for the purpose of calculating pension benefits under the Code provisions. Because of the Department of Law's directive, the Plaintiffs did not receive their unused vacation day payments *during* their period of service as specified by section 3.37.020; instead, they received the payments subsequent to the termination of their employment. In consequence, and pursuant to the plain language of the Metro Code, the lump-sum awards for unused vacation days could not literally be included as a part of "average earnings" for purposes of calculating pension benefits because payment was made subsequent to termination.[8]

---

8. We acknowledge that this literal interpretation of the code allows those who terminated

their employment, prior to the directive by

But there are other reasons for the exclusion of the payments from the formula. The Plaintiffs contend that Metro should have paid for accrued vacation "prior to the final point of termination" because Rule 5.13 states that such employees whose services "*are being* terminated ... shall be paid for all regular earnings due and accrued *and* vacation pay" (emphasis added). The Plaintiffs argue that the phrase "are being terminated" specifies that the termination will be in the future, after the payment. This Court recognizes the importance of verb tense in a phrase. For example, in *Baker v. Donegan,* 164 Tenn. 625, 52 S.W.2d 152, 153 (1932), we observed that the use of the future perfect tense, "shall have," applies to some event in the time to come. But that case also requires consideration of the context of the terminology. *Id.* ("Whether this literal meaning is to be followed may be controlled by the context.").

Rule 5.13, when read contextually, separates "all regular earnings *due and accrued*" (emphasis added) from "vacation pay" with the conjunction "and." We interpret "regular earnings" to mean only those earnings that occur on a consistent, periodic basis such as salary payment. Several other jurisdictions agree with our interpretation. In *Gentile v. City of Detroit,* 139 Mich.App. 608, 362 N.W.2d 848, 852 (1984), for example, the court held that there was no abuse of discretion in excluding optical care, excuse time, recall pay, sick leave, bonus vacation days, life insurance, death benefits, funeral leave days, and emergency days in the calculation of pension benefits, where such payments were not made regularly during an employee's tenure. *See also Stover v. Ret. Bd. of St. Clair Shores Firemen & Police Pension Sys.,* 78 Mich.App. 409,

260 N.W.2d 112, 114 (1977) (holding that a lump-sum payment is not included in "average final compensation" for pension calculation because such payments are not made regularly during a worker's tenure with the city, are properly viewed as a retirement bonus, and not considered annual compensation received during a certain number of years immediately preceding the member's retirement). In *Chancellor v. Department of Retirement Systems,* 103 Wash.App. 336, 12 P.3d 164, 169 (2000), a Washington court ruled that payments made in lieu of taking vacation leave were "special" and not a part of "basic salary" used to determine the amount of plaintiff's pension or retirement benefits. *See also Bd. of Trustees of the State Police Ret. Sys. v. Halsell,* 271 Ark. 815, 610 S.W.2d 881, 882–83 (1981) (holding that where the statute excluded a "lumpsum" payment to a "terminating employee" from salary, the payment should not be added to the employee's average salary for the calculation of his retirement pension). Further, in *Longley v. State Employees Retirement Commission,* 284 Conn. 149, 931 A.2d 890, 902 (2007), Connecticut's highest court ruled that certain provisions of a statute allowing an employee "leaving" state service to receive a lump-sum payment for accrued vacation time indicated a legislative intent to exclude such payments from the employee's salary for the purpose of determining base salary.

Metropolitan Executive Order Number 42, issued in 1971, mandated that salaries be paid after the pay period is completed. So, even though Rule 5.13 uses the phrase "are being terminated," regular salary has for years been directed to take place after the date of termination. There is little reason to interpret the Code so as to treat "vacation pay," any differently.[9]

---

the Department of Law issued on September 13, 2001 and who received their lump-sum

payment prior to their retirement, to receive a higher pension.

9. As a practical matter, the actual amount

Another reason to reject the Plaintiffs' interpretation is that it would frustrate the purpose of the pension scheme. Facing similar facts, the Supreme Court of Connecticut further reasoned in *Longley* that calculating the lump-sum payment for accrued vacation time would result in averaging a seventeen month period of state service versus a twelve month period. *Longley*, 931 A.2d at 894–904. The West Virginia Supreme Court of Appeals has taken a comparable position, ruling that, pursuant to statute, calculation for disability payments should not include a lump-sum payment for accrued vacation and sick leave. *Craig v. City of Huntington*, 179 W.Va. 668, 371 S.E.2d 596, 600 (1988). Many of the Plaintiffs in this case had sixty days of unused vacation time at the time of their retirement. That would be the equivalent of almost three months of pay. In effect, the inclusion of their lump-sum payment for the maximum vacation accrual would extend the pension calculation period to sixty-three months. That would conflict with Metropolitan Code section 3.08.010(1), requiring an employee's pension to be based on a sixty-month calculation.

The lump-sum vacation payments appear to be an effort by Metro to afford fair treatment to the terminating employees with remaining vacation credit. These payments provide a workable alternative to forcing a retiring employee to take a vacation at the end of his or her term. At the same time, Metro might have determined that those employees who have taken advantage of their vacation time should not be penalized with a lesser pension. Excluding accrued vacation payment from the pension calculation appears to treat all employees equally and pro-

mote uniformity as to vacations and pensions. Our research indicates that many other jurisdictions have employed similar logic in assessing legislative intent. In *Santa Monica Police Officers Association v. Board of Administration, Public Employees' Retirement System*, 69 Cal. App.3d 96, 100, 137 Cal.Rptr. 771 (1977) (hearing denied June 9, 1977), for example, a California Court concluded that the legislature intended to exclude nonperiodic payments that did not apply to all employees similarly situated from pension computations. *See also Stover*, 260 N.W.2d at 114 ("Annual compensation received does not include unused … vacation payments because those payments are not made regularly during a worker's tenure with the City. Those payments are properly viewed as a retirement bonus received at retirement and not as annual compensation received during a certain number of years immediately preceding the member's retirement."); *Craig*, 371 S.E.2d at 600 ("We believe … that a lump sum payment for accrued vacation and sick leave covering a number of months cannot be considered as a part of the monthly salary or compensation."). In our view, calculating the lump-sum payments with employees' pensions would create an unintended "windfall" for employees who did not take vacation. *See Kosey v. City of Washington Police Pension Bd.*, 73 Pa.Cmwlth. 564, 459 A.2d 432, 434 (1983) (reasoning that the legislature did not intend "for certain retirees to receive a large windfall simply because their [employer chose] to pay them a lump-sum for unused vacation time in lieu of requiring them to take their vacation time prior to their official retirement date"). It is unlikely that the drafters of

due cannot be calculated precisely until the terminating employee actually works during the final days of his or her employment or chooses not to work by taking advantage of a

portion of the unused vacation days. For example, if the employee elects to take his last day off as a vacation, the amount of the pension would change.

the Metro Code intended to reward those who did not take vacation and sanction those who did.[10] *See W. Va. Consol. Pub. Ret. Bd. v. Carter*, 219 W.Va. 392, 633 S.E.2d 521, 528, 530 (2006) (finding that "final average salary" does not permit the inclusion of payments for unused, accrued vacation in calculation of retiree benefits; the legislature did not intend to make a distinction in retirement benefits between a retiree who took a vacation and one who did not).

Finally, we make particular note of the fact that the Metro pension ordinance specifically allows an employee to elect to use sick leave for pension eligibility credit or service credit; however, there is no corresponding provision authorizing an employee to use vacation leave in the same way. Metropolitan Code section 3.33.050, which generally applies to Metropolitan Government employees, and section 3.37.050, which pertains to Metropolitan Government police and fire employees, both provide as follows:

> Any member with unused sick leave time, at service retirement, shall receive one hundred percent credit, subject to an affirmative election at the time of retirement, and in accordance with the board's policies and procedures, as follows:

1. Pension eligibility credit; or
2. Service credit.

The ordinance, inferentially designed to encourage employees to maintain healthy living habits, by way of reward, does not provide for vacation time to be used for either service credit or to increase the pension base calculation. *Expressio unius est exclusio alterius* ("to express one thing is to exclude others"). *TRW Inc. v. Andrews*, 534 U.S. 19, 28–29, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001); *State v. Strode*, 232 S.W.3d 1, 10 (Tenn.2007). We infer, therefore, that if the Metropolitan Council had intended for accrued vacation to be treated in a similar manner as sick leave, it would have expressed that intent explicitly. *See, e.g., State v. Lewis*, 958 S.W.2d 736, 739 (Tenn.1997) (stating that "[w]hen one statute contains a given provision, the omission of the same provision from a similar statute is significant to show a different intent existed"); *M. DeMatteo Constr. Co. v. City of New London*, 236 Conn. 710, 674 A.2d 845, 849 (1996) (stating that when "a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject … is significant to show that a different intention existed").

**10.** In *Longley*, 931 A.2d at 896–97 n. 12 (Conn.2007), the Court recited a lengthy analysis by the trial court, which explained the principle of how certain employees similarly situated would get very different pension results, depending on whether they took time off for vacation. The analysis showed that when including the lump-sum payment in the pension calculation for an employee making approximately $50,000, the pension would be about $9,000 a year higher than when the lump-sum payment was not included in the pension calculation, according to the relevant pension formula. The Court stated: "The trial court observed that it was not likely that the legislature 'intended to reward, to the tune of [$9,000] a year in [each of] the [plaintiffs' cases], a practice of not taking vacation days. Vacation presumably benefits both the employee and the employer, and it seems odd … that a unilateral choice might result in … such a windfall.' " *Id.* at 896–97 (alterations in original); *see also*, Alina Tugend, *Vacations Are Good for You, Medically Speaking*, N.Y. Times, June 7, 2008, http://www.nytimes.com/2008/06/07/business/yourmoney/07shortcuts.html?—r=1 & oref=slogin (A study of 12,000 men over nine years, published in 2000 indicated that those who failed to take annual vacations had a 21% higher risk for coronary heart disease; an earlier study of women concluded that women who took vacations once every six years or less were almost eight times more likely to develop coronary disease or have a heart attack than those who took at least two vacations a year).

In summary, until October 2001, there was no uniform policy or practice as to when the payment for unused, accrued vacation time would be made to a terminating employee. Pursuant to the uniform payment policy adopted October 31, 2001, however, accrued vacation time could no longer be paid until an employee retires, as a part of the last paycheck. The Metro Code makes no provision for including payments for accrued vacation in their pension calculations, nor do we believe that one should be implied.

### B. *Class Action*

The Plaintiffs also claim that the trial court wrongly denied their third motion to amend to convert this case to a class action. Because the Plaintiffs are not entitled to the relief sought, we need not address the question of whether the trial court erred by not certifying the case as a class action. *See generally* Tenn. R. Civ. P. 23.

### IV. Conclusion

Pursuant to applicable provisions of the Metro Code, lump-sum payments for unused vacation days received by the Plaintiffs subsequent to their termination of employment were not includable in the Plaintiffs' "average earnings" for purposes of calculating their retirement benefits. Accordingly, the judgment of the Court of Appeals upholding the trial court's grant of summary judgment is affirmed. Costs are assessed to the Plaintiffs, and their sureties, for which execution may issue if necessary.

1. Oral argument was heard in this case on May 8, 2008, in Jacksboro, Campbell County, Tennessee, as part of this Court's S.C.A.L.E.S.