IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

_____

AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES
AFL-CIO LOCAL 2384, ET AL.,
*Plaintiffs/Appellants*,

*v.*

CITY OF PHOENIX, ET AL.,
*Defendants/Appellees.*

_____

No. CV-19-0143-PR
Filed July 10, 2020
_____

Appeal from the Superior Court in Maricopa County
No. CV2014-011778
The Honorable Roger E. Brodman, Judge
**AFFIRMED**

_____

Memorandum Decision of the Court of Appeals
Division One
1 CA-CV 18-0027
Filed May 21, 2019
**VACATED IN PART**

_____

COUNSEL:

Susan Martin (argued), Daniel L. Bonnett, Jennifer L. Kroll, Michael M. Licata, Martin & Bonnett, PLLC, Phoenix, Attorneys for American Federation, et al.

Eric M. Fraser (argued), Colin F. Campbell, Hayleigh S. Crawford, Osborn Maledon, P.A., Phoenix, Attorneys for City of Phoenix, et al.

_____

VICE CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL and JUSTICES BOLICK, GOULD, LOPEZ, BEENE, and MONTGOMERY joined.

_____

VICE CHIEF JUSTICE TIMMER, Opinion of the Court:

¶1        The City of Phoenix pays pension benefits to eligible employees upon retirement. The amount of that benefit depends, in part, on a retiring employee's highest average annual compensation paid over a multi-year period. The City also pays employees for unused accrued vacation leave upon retirement or separation from employment. Here, we decide whether a one-time payout for unused vacation leave forms part of an employee's compensation for purposes of calculating that employee's pension benefit. We hold it does not.

## BACKGROUND

¶2        Most City of Phoenix employees are members in the City of Phoenix Employees' Retirement Plan ("Plan"), a defined benefit plan codified in the Phoenix City Charter ("Charter"). A member is entitled to receive a pension upon retirement, which is determined by multiplying a member's "final average compensation," total years of credited service, and a Plan-specified benefit rate. *See* Phx., Ariz., Charter ch. 24, art. 2, § 19.1. "Final average compensation" is an average of a member's highest annual compensation paid over a period of consecutive years, the length of which depends primarily on the member's hiring date. *See id*. §§ 2.14, 2.22–2.24. Compensation can be monetary ("salary or wages") or non-monetary. *See id*. § 2.13. For ease of reference, we refer to compensation used in calculating "final average compensation" as "pensionable" or "pensionable compensation."

**¶3** The City provides paid vacation leave to employees and encourages its use. *See* Phx., Ariz., Admin. Reg. 2.18 (2014) ("Vacation Leave is an important benefit to an employee's health, productivity, personal development, and enjoyment of life. <u>Vacation leave should be taken.</u>"). Regardless, for decades the City has permitted eligible employees to profit financially from foregoing vacations. Each year, members may "sell back" for a lump sum payment any unused vacation leave earned that year. *See id.* Also, upon retirement or separation from employment, members may "cash out" for a lump sum payment up to two and one-half years' accrued vacation leave. *See id.* (permitting employees to "cash out" between 240 and 450 unused vacation leave hours, depending on position and years of service). And, although not required to do so by rule or regulation, for decades the City treated these payouts as pensionable, thereby permitting members to increase or "spike" their pension benefits. Indeed, the City repeatedly told members these payouts could be included in their final average compensation calculations to "maximize" pension benefits.

**¶4** In 2013, the City acted to reduce rising pension costs by eliminating pension "spiking." It revised Administrative Regulation ("A.R.") 2.18 effective July 1, 2014 to explicitly exclude as pensionable compensation "cash out" payments made upon retirement or separation from employment for unused vacation leave accrued *after* that date. *See id.* As a result, such payouts are no longer included in calculating a retiring member's final average compensation, generally lowering pension benefits for members. The amended regulation is prospective, however, meaning the City will continue to include "cash out" payments for vacation leave accrued *before* July 1, 2014 in calculating a member's final average compensation.[1] *See id.*

**¶5** Petitioners are individual Plan members and unions that represent Plan members under the City's meet-and-confer ordinance (collectively, "Petitioners"). *See* Phx., Ariz., Code § 2-214(B) (providing that public employees, with exception, have "the right to be represented by an

---

[1] The revision to A.R. 2.18 does not address whether annual vacation leave "sell back" payments are pensionable. Such payments are not at issue here. *See infra* ¶ 24.

employee organization of their own choosing, to meet and confer" with their employer "in the determination of wages, hours and working conditions, and to be represented in the determination of grievances arising thereunder"). They sued the City, the Plan, and the City of Phoenix Employees' Retirement Plan Board (collectively, the "City"), alleging that the 2014 revision to A.R. 2.18 unlawfully "redefine[d] and limit[ed] the Charter's definition of compensation and final average compensation" by not considering vacation leave "cash outs" upon retirement or separation as pensionable compensation. Consequently, they asserted, the City diminished and impaired their vested rights to pension benefits in violation of the Pension and Contract Clauses of the Arizona Constitution, *see* Ariz. Const. art. 2, § 25; *id.* art. 29, and the Contract Clause of the Federal Constitution, *see* U.S. Const. art. 1, § 10.

¶6 The trial court granted summary judgment for the City and denied Petitioners' cross-motion for summary judgment. It ruled that because one-time accrued vacation leave payouts are not regularly paid on an annual basis, they are not "salary or wages" used in calculating a member's final average compensation. It further found that members did not have vested rights in unearned vacation leave, meaning the City was free to discontinue permitting members to spike pensions with "cash out" payments for vacation leave accrued after July 1, 2014. Because members did not have a right to include such payouts as pensionable compensation, the court concluded the City did not violate members' constitutional rights by prospectively discontinuing the practice. The court of appeals affirmed. *Am. Fed'n of State Cty. & Mun. Emps. AFL-CIO Local 2384 v. City of Phx.* (*AFL-CIO Local 2384*), No. 1 CA-CV 18-0027, 2019 WL 2191112 at *1 ¶ 1 (Ariz. App. May 21, 2019) (mem. decision).

¶7 We accepted review to provide guidance concerning the interpretation of public employee pension plans, a matter of statewide importance.

**DISCUSSION**

**I.**

¶8 Public employee pension rights are well protected in Arizona. Under our constitution, "[m]embership in a public retirement system is a

contractual relationship." *See* Ariz. Const. art. 29, § 1(C). As such, it is protected by our Contract Clause, *id.* art. 2, § 25, which prohibits laws "impairing the obligation of a contract." *See id.* art. 29, § 1(C); *see also* U.S. Const. art. 1, § 10 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts."). Pension benefits are additionally protected by the Pension Clause, Ariz. Const. art. 29, § 1(D), which, with exceptions inapplicable here, prohibits benefits from being "diminished or impaired." *See Fields v. Elected Officials' Ret. Plan*, 234 Ariz. 214, 218 ¶ 17 (2014) ("The Contract Clause applies to the general contract provisions of a public retirement plan, while the Pension Clause applies only to public retirement benefits."). Neither the Pension Clause nor the Contract Clause, however, provides an independent source of substantive rights; they "only protect whatever pension rights [members] ha[ve] under applicable law." *See Cross v. Elected Officials Ret. Plan*, 234 Ariz. 595, 599 ¶ 9 (App. 2014).

¶9 A public employee's pension rights vest "upon acceptance of employment." *Fields*, 234 Ariz. at 221 ¶ 31 (quoting *Yeazell v. Copins*, 98 Ariz. 109, 115 (1965)). These rights include using the benefit calculation formula in place at the start of employment, together with any beneficial changes made to that formula during employment. *Id.* at 220 ¶ 27. Thus, if Petitioners had rights to include one-time payouts for accrued vacation leave in their "final average compensation" before the City revised A.R. 2.18 in 2013, the City cannot eliminate that practice for Petitioners without their consent. *See Hall v. Elected Officials' Ret. Plan*, 241 Ariz. 33, 41 ¶ 23 (2016) (holding that the legislature's unilateral increase of statutory contribution rate and detrimental change to statutory formula granting permanent benefit increases breached public employees' employment contracts); *Fields*, 234 Ariz. at 216 ¶ 1 (concluding the legislature violated the Pension Clause by changing an existing statutory formula for calculating benefit increases for retired members); *Yeazell*, 98 Ariz. at 116 (holding that a municipality could not calculate a police officer's pension benefit using a statutory formula that was less beneficial than one existing at the start of employment as doing so without the officer's assent would alter the employment contract). Whether such rights exist depend on the Plan's terms and, alternately, whether Petitioners had an independent contractual right to include these payouts in the benefit formula calculation.

**A.**

¶10 The primary issue here is whether a one-time payout for accrued vacation leave upon retirement or separation is "compensation" under the Plan that must be included when calculating a member's "final average compensation," which is used in determining the pension benefit amount. Resolution of this issue turns on the meaning of "compensation," which the Plan defines as "a member's salary or wages paid him by the City for personal services rendered by him to the City." *See* Phx., Ariz., Charter ch. 24, art. 2, § 2.13. The Plan does not define "salary or wages," and that is the task before us.

**i.**

¶11 Petitioners argue we should refrain from interpreting "salary or wages" and simply defer to the City's historical practice of treating one-time payouts for accrued vacation leave as pensionable compensation. They assert the Plan gives the City of Phoenix Employees' Retirement Plan Board ("Board") sole authority to interpret Plan terms, and the Board acted within that authority. Relatedly, Petitioners argue we must acquiesce in the Board's historical practice because that practice was "not manifestly erroneous" and had been uniformly applied for years. *See Bohannan v. Corp. Comm'n*, 82 Ariz. 299, 303 (1957) ("Uniform acquiescence of meaning, if it is not manifestly erroneous, will not be disturbed, at least in cases of doubt, for injustices are likely to result after a long period of time during which many rights will necessarily have been acquired."). We disagree.

¶12 Petitioners overlook that in 2013 the Board prospectively discontinued including one-time payouts for accrued vacation leave upon retirement or separation as pensionable compensation. Deferring to the Board's current interpretation of what is included in "salary or wages" would not advance Petitioners' position. Also, although the Plan authorizes the Board to "constru[e]" its terms, *see* ch. 24, art. 2, § 4.1, it does not authorize the Board to change the Plan through historical practice or otherwise. Only City voters may amend the Plan. *See* Phx., Ariz., Charter ch. 22, § 2 ("No amendment shall be effective until approved by a majority vote of the qualified electors voting thereon at a regular or special election."). For these reasons, we decline to defer to the Board's historical practice. *See Wade v. Ariz. State Ret. Sys.*, 241 Ariz. 559, 563 ¶ 21 (2017).

**ii.**

**¶13**  Because the Plan is set out in the Charter, which is "effectively, a local constitution," *State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 598 ¶ 39 (2017) (quoting *City of Tucson v. State*, 229 Ariz. 172, 174 ¶ 10 (2012)), we review its interpretation de novo as a matter of law, *see Twin Cities Fire Ins. Co. v. Leija*, 244 Ariz. 493, 495 ¶ 10 (2018). We interpret the Plan to effectuate the intent of the voters who adopted it. *See Fields*, 234 Ariz. at 219 ¶ 19. In doing so, we give words their ordinary meanings, *see Wade*, 241 Ariz. at 562 ¶ 14, unless the context suggests otherwise, *see Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017). We may also examine the Plan as a whole along with related provisions in the Charter to interpret specific Plan provisions. *See id.* If the Plan is "subject to only one reasonable interpretation, we apply it without further analysis." *See Glazer v. State*, 237 Ariz. 160, 163 ¶ 12 (2015). If more than one reasonable interpretation exists, however, we will consider secondary principles, including the purpose of the Plan and the effects and consequences of different interpretations, to identify the correct one. *See id.*

**¶14**  The Plan was created in 1953, when voters amended the Charter to replace an existing retirement system. *See* ch. 24, art. 1, § 1; *id.* art. 2, § 3. To arrive at voters' intent, we consider the meaning of the Plan's words in 1953. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) ("Words must be given the meaning they had when the text was adopted."). Dictionaries at that time generally defined "salary" and "wages" as fixed amounts paid to employees at regular, periodic intervals in return for their services. *See, e.g., Salary*, Webster's New Int'l Dictionary (2d ed. 1946) (defining "salary" as "[t]he recompense or consideration paid, or stipulated to be paid, to a person at regular intervals for services" and as "fixed compensation regularly paid, as by the year, quarter, month, or week"); *Wages*, Webster's New Int'l Dictionary, *supra* (defining "wages" as payouts for labor made "at short stated intervals"). The terms were distinguished by the type of work performed by recipients of salary or wages. Thus, "salary" was generally characterized as compensation for "holders of official, executive, or clerical positions" while "wages" were paid "for labor, usually manual or mechanical." Webster's New Int'l Dictionary, *supra*.

**¶15**         Applying these definitions, the trial court and the court of appeals concluded that neither "salary" nor "wages" includes one-time payouts for accrued vacation leave upon retirement or separation. *See AFL-CIO Local 2384*, at *4 ¶¶ 19–20. They reasoned that such payouts are not made in regular, equal installments but are paid in one lump sum, when members leave employment. *See id.*; *cf. Wade*, 241 Ariz. at 562–63 ¶¶ 15, 22 (concluding that city-paid share of deferred compensation "payable in regular, equal installments, in exchange for employment services" was part of pensionable salary).

**¶16**         Petitioners urge us to reach a different conclusion because some dictionaries in 1953 broadly defined "salary" and "wages" as including all forms of remuneration, including that which is paid irregularly. *See, e.g.*, *Salary*, Black's Law Dictionary (4th ed. 1951) (defining "salary" generally as "[a] reward or recompense for services performed" and only "[i]n a more limited sense" to mean "a fixed periodical compensation paid for services rendered"); *Wages*, Black's Law Dictionary *supra* (defining "wages," in part, as "[e]very form of remuneration payable for a given period to an individual for personal services, including . . . vacation pay, dismissal wages, [and] bonuses"). Therefore, Petitioners assert, the terms can be reasonably interpreted as including one-time payouts for accrued vacation leave. And because the City permitted such payouts in 1953 when voters adopted the Plan, and the Board historically treated them as pensionable until 2013, Petitioners urge us to apply the broad definitions of "salary" and "wages" and treat these payouts as pensionable.

**¶17**         Referring only to dictionary definitions of "salary" and "wages" does not reveal the meaning given to the terms by voters. We agree with the City, however, that when viewed in context, "salary or wages" can only reasonably mean fixed amounts paid annually to members at regular, periodic intervals in return for their services. It does not include irregular, one-time payouts made to members upon retirement or separation to recoup the value of unused benefits previously bestowed in return for personal services. Although such payouts are compensatory, they are not pensionable for several reasons.

¶18          First, as it did in 1953, the Charter contemplates that salary and wages are paid regularly.  Excepting City officers, employees must be paid "wages" on "regular days not more than sixteen (16) days apart."  *See* Phx., Ariz., Charter ch. 19, § 6.  (Because this provision applies to all employees except officers, it necessarily encompasses "salary" payday intervals.)   A one-time payout for unused vacation leave is not paid regularly; it is paid once and only upon retirement or separation.

¶19          Other courts have held that similar, irregularly timed payouts are not pensionable salary or wages.  *See, e.g.*, *Cross*, 234 Ariz. at 604, 605 ¶¶ 31, 35 (stating that irregularly paid "bonuses or payments made to a member in lieu of sick time or vacation" are not included in calculating "average annual salary" for pension benefit purposes); *Int'l Ass'n of Firefighters, Local No. 64  v. City of Kansas City*, 942 P.2d 45, 48 (Kan. Ct. App. 1997) ("By definition, then, a lump sum payment which occurs once upon retirement cannot be a periodic payment."); *Stover v. Ret. Bd. of City of St. Clair Shores Firemen & Police Pension Sys.*, 260 N.W.2d 112, 114 (Mich. Ct. App. 1977) (deciding that annual compensation used to calculate pension benefit does not include one-time payouts for unused sick or vacation leave "because those payments are not made regularly during a worker's tenure with the City" and are akin to a "retirement bonus"); *W. Va. Consol. Pub. Ret. Bd. v. Carter*, 633 S.E.2d 521, 526 (W. Va. 2006) (concluding that "final average salary" excludes one-time payouts for unused vacation days because they are not part of employees' fixed income that is paid regularly); *Craig v. City of Huntington*, 371 S.E.2d 596, 600 (W. Va. 1988) ("[A] lump sum payment for accumulated sick leave, vacation, or holiday pay is not includable in the salary base for the purpose of calculating disability pension benefits.").

¶20          Second, the Plan's calculation of pension benefits depends on a member's *annually* paid salary or wages.  A member's "final average compensation," used to determine the benefit amount, is "the average of the highest annual compensation" paid over either three or five consecutive years, depending on the member's hiring date, within the last ten years of credited service.  *See* ch. 24, art. 2, §§ 2.14, 2.22–2.24.  If the member is employed for fewer than three or five years, "final average compensation" is the "average of his compensation" during those years of employment. *See id*. § 2.14; *see also id*. § 2.15 (defining "final compensation" as "a

member's annual rate of compensation at the time his City employment last terminates"). The Plan's focus on averaging compensation paid annually precludes including a one-time payout for unused vacation leave that, by its terms, is not paid annually but only in the year of retirement or separation. *See Carter*, 633 S.E.2d at 526–27 ("The adjective, 'annual,' means that the salary is specified or calculable in terms of a regular annual or yearly amount, which may be payable in equal monthly, semi-monthly, or other periodic installments.").

**¶21**		Third, including a one-time payout for unused vacation leave as pensionable "salary or wages" would violate the Plan by adding days, weeks, or months to its pension-calculation period. Consider a member whose final average compensation is calculated by averaging the highest annual compensation over three consecutive years. *See* ch. 24, art. 2, § 2.14(a). If that member "cashes out" two months of unused vacation leave at retirement, because the member has already been paid for three full years of work, including that lump-sum payout would effectively include three years and two months of compensation within the three-year average. This would violate the Plan and so could not have been intended by voters. Other courts have reached similar conclusions. *See Longley v. State Emps. Ret. Comm'n*, 931 A.2d 890, 901 (Conn. 2007) (agreeing that "adding the value of any accrued vacation time to the retiree's salary . . . effectively [extends] the period of state service on which the retiree's base salary is predicated beyond the statutorily mandated period of three years"); *Amos v. Metro. Gov't of Nashville*, 259 S.W. 3d 705, 714 (Tenn. 2008) (stating that including pay for three months of unused vacation time in the pension calculation would extend the required sixty-month calculation to sixty-three months in violation of the city code).

**¶22**		Even if the Plan could reasonably be interpreted as including one-time payouts for accrued vacation leave upon retirement or separation, the consequence of this interpretation further persuades us that the voters did not intend it. Nothing in the Plan indicates that voters wanted to give members who stockpiled vacation time more lucrative pension benefits than members who used their allotted leave. The disparity resulting from Petitioners' position is demonstrated by this example: Two members with the same position, salary, and years of credited service retire, and their final average compensation is based on the highest annual compensation for

three consecutive years. Assuming they each made $50,000 in year one, $55,000 in year two, and $60,000 in year three, each member's final average compensation would be $55,000. But under Petitioners' view, if one member "cashed out" two months' unused vacation leave, which would be $10,000 using his final salary rate, his final average compensation would be $58,333 ($50,000 + $55,000 + $60,000 + $10,000 ÷ 3). In that circumstance, his annual pension benefit would be greater than that of his coworker who used his vacation, although the members were otherwise identically situated.

**¶23** We agree with other courts that absent language to the contrary, no logical reason exists to conclude that voters intended to grant a lifetime windfall to members who refrained from taking vacation. *See Longley*, 931 A.2d at 904 (stating it is "highly unlikely" that in addition to providing "significant lump sum payments" to employees for unused vacation time, "the legislature also intended to bestow a substantial annual windfall on them for the duration of their retirement—in essence, a lifetime annuity—merely because they chose to stockpile their vacation time rather than to use it."); *Amos*, 259 S.W.3d at 714–15 ("It is unlikely that the drafters of the Metro Code intended to reward those who did not take vacation and sanction those who did."); *Carter*, 633 S.E.2d at 528 (concluding that the legislature did not intend to make a distinction in retirement benefits between a retiree who took a vacation and one who did not). Although "cash out" payments equalize compensation between members who did not use all their vacation leave and those who did, using those payouts to increase pension benefits would result in unequal treatment among members. *See Amos*, 259 S.W.3d at 714 ("Excluding accrued vacation payment from the pension calculation appears to treat all employees equally and promote uniformity as to vacations and pensions."). If voters intended unequal treatment, we would expect to see language in the Plan to that effect. *See Longley*, 931 A.2d at 904 ("Because there is no logical reason why the legislature would embrace such a policy, we will not lightly presume that it intended to do so."). Indeed, we can safely assume that the City's policy in 1953, as today, was to encourage members to use vacation leave. Treating payouts for accrued leave as pensionable encourages exactly the opposite.

¶24 Petitioners argue that if pensionable "salary or wages" are limited to fixed amounts paid regularly, then sporadically paid remuneration—such as overtime, comp time pay, shift-differentials, out-of-class pay, and standby pay, which have been included in calculating "final average compensation"—could be excluded "on a whim." They also argue there is "no discernable difference" between one-time "cash out" payments for accrued vacation leave and annual "sell back" payments for unused vacation earned in the payment year, which the City considers pensionable. Whether these types of remuneration are pensionable is not before us. Regardless, the City's treatment of other types of remuneration as pensionable does not shed light on the voters' intent in using the term "salary or wages" when defining pensionable compensation.

¶25 In sum, pensionable "salary or wages" means fixed amounts paid annually to members at regular, periodic intervals in exchange for personal services. Even if one-time payouts for accrued vacation leave are given in exchange for additional personal services performed by members, because they are not paid annually or at regular intervals, they are not pensionable "salary or wages."

**B.**

¶26 Petitioners alternately argue that regardless of the Plan's benefit formula, the City's pre-2013 promises to members that it would treat one-time vacation leave payouts as pensionable, together with the historical fulfillment of those promises, formed "pension benefit contracts" independent of the Plan and granted Petitioners vested rights to that practice. By revising A.R. 2.18 to eliminate that practice, Petitioners contend, the City breached those contracts and impaired vested rights protected by the Contract and Pension Clauses. The City responds that Petitioners only have enforceable pension rights to the extent bestowed by the Plan.

¶27 Petitioners rely on Restatement (Second) of Contracts § 201 cmt. c (Am. Law Inst. 1981), which provides that "mutual understanding of the parties [about the meaning of an agreement] prevails even where the contractual term has been defined differently by statute or administrative regulation." But § 201 and its comment address interpretation of an existing agreement between parties, not whether an erroneous interpretation forms

a new contract. And because interpretation of the Plan depends on the voters' intent, not the parties' common understanding of the Plan's meaning, Restatement (Second) of Contracts § 201 cmt. c is inapplicable.

**¶28** Petitioners also assert that Charter Chapter IV § 2(69) granted the City authority to make enforceable pension promises in addition to those in the Plan. That section provides that "no mention of a particular power shall be construed to be exclusive or to restrict the scope of the powers which the City would have if the particular power were not mentioned." Regardless of its scope, this provision does not authorize the City to act in conflict with the Plan's benefit calculation formula, which only voters can amend. *See* ch. 22, § 2. As explained, *see supra* ¶¶ 17–23, including one-time accrued vacation leave payouts in calculating final average compensation would not supplement the Plan, it would conflict with the Plan's benefit calculation formula. *See Paddock v. Brisbois*, 35 Ariz. 214, 221 (1929) (stating that a city is "impotent" to change the "organic law of the city" reflected in its charter). Consequently, Charter Chapter IV § 2(69) did not authorize the City to treat the one-time payouts as pensionable compensation. *Cf. Chanay v. Chittenden*, 115 Ariz. 32, 35 (1977) (stating that an implied contract cannot exist when an express contract addresses the same subject matter and concluding that even if appellant could prove an implied agreement under some equitable theory, "he could only have done so if there were no express agreement to the contrary"); *City of Countryside v. City of Countryside Police Pension Bd. of Trs.*, 122 N.E.3d 297, 318 ¶¶ 69–70 (Ill. App. Ct. 2018) (rejecting argument that a city was equitably estopped from disregarding prior agreement with unions that altered the statutory pension formula and noting that otherwise "a city administration and the union could agree to grant officers million-dollar-a-year pensions, and future administrations would be helpless but to find some way to fund that largesse for decades").

**¶29** Petitioners' citations to decisions from other courts do not persuade us to reach a different conclusion. Most do not address whether past administrative practice could create a contractual right independent of a then-existing pension law governing the practice, which is the issue here. *See Flisock v State, Div. of Ret. & Benefits,* 818 P.2d 640, 644 (Alaska 1991); *In re Pension Reform Litig.*, 32 N.E.3d 1, 17–18 ¶ 47 (Ill. 2015); *Halpin v. Neb. State*

*Patrolmen's Ret. Sys.*, 320 N.W.2d 910, 914–15 (Neb. 1982); *Kranker v. Levitt*, 281 N.E.2d 840, 841 (N.Y. 1972).

**¶30**		*Bowles v. Washington Department of Retirement Systems*, 847 P.2d 440 (Wash. 1993), provides limited support to Petitioners' argument. Washington's Public Employees' Retirement System Plan I treats one-time payouts for unused leave at termination as pensionable. *Id.* at 443. Some public employers restricted the amount of leave that could be "cashed out" while others did not. *Id.* at 444. The *Bowles* court addressed whether the pension administrator violated vested pension rights by changing its practice of treating all unused leave as pensionable regardless of these restrictions. *Id.* at 446. The court held that the administrator's prior practice created vested rights in its future continuation, and the administrator violated those rights by changing its practice. *Id.* at 448. Significantly, the court rejected the administrator's argument that "the change was necessary in order to bring its practice in compliance with the statutes" and the administrator "must be given leeway in correcting practices when errors become evident." *Id.* at 447.

**¶31**		We do not find *Bowles* persuasive. The court did not address the interplay between any statutory directives and the administrator's practice and did not conclude that the administrator's practice created contractual rights apart from the pension plan. *Id.* Instead, the court simply rejected the administrator's argument as disingenuously raised. *Id.* ("It is difficult to give this argument much credence when the evidence shows that the [administrator] waited some 4 to 10 years before acting to change its procedures."). Here, throughout the time the City treated one-time accrued vacation leave payouts as pensionable, the Plan's benefit calculation formula was inconsistent with that practice. *Bowles* did not directly address a similar circumstance. And to the extent it did, we reject it as unconvincing.

**¶32**		In sum, Petitioners do not have contractual rights independent of the Plan to include one-time payouts for accrued vacation leave in the Plan's benefit calculation formula. Thus, the City did not violate any vested rights by prospectively eliminating payouts for leave accrued after July 1, 2014, from the calculation of final average compensation.

## II.

¶**33**        Petitioners and the City both request an award of attorney fees pursuant to A.R.S. § 12-341.01.  Because Petitioners are not the prevailing parties, we deny their request.  In the exercise of our discretion, we grant the City's request.  This case is distinguishable from *Wistuber v. Paradise Valley Unified School District*, 141 Ariz. 346, 350 (1984), which stated that courts should generally refrain from awarding fees under § 12-341.01 against citizens who sue to challenge the legitimacy of government action because it would "chill" such suits.  Here, Petitioners challenged A.R. 2.18 as parties to a contract rather than as aggrieved citizens.

## CONCLUSION

¶**34**        We affirm the trial court's summary judgment.  Although we agree with the court of appeals' disposition on the issues accepted for review, we vacate ¶¶ 1–32 of the decision to replace its reasoning with our own.