# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
May 22, 2012 Session

## JEFFERY SMITH and BRENDA K. SMITH v. METHODIST HOSPITALS OF MEMPHIS, ET AL.

### Direct Appeal from the Circuit Court for Shelby County
No. CT-004846-00      Kay S. Robilio, Judge

### No. W2011-00054-COA-R3-CV - Filed August 31, 2012

This lawsuit originated as a medical malpractice action that was filed against the Hospital and other defendants in 2000. The trial court granted summary judgment in favor of the Hospital on the medical malpractice claim in 2003 because Plaintiffs had failed to come forward with competent testimony from a medical doctor regarding causation. Thereafter, Plaintiffs filed a supplemental complaint to allege that the Hospital had tortiously interfered with the Plaintiffs' contract with a nurse expert witness. The trial court granted summary judgment in favor of the Hospital on this claim in 2010. Plaintiffs appealed. We affirm the trial court's order granting summary judgment on the issue of tortious interference with contract, but we reverse the trial court's order granting summary judgment on the medical malpractice claim and remand for further proceedings.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part and Remanded

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Lenal Anderson, Jr., Memphis, Tennessee, for the appellants, Jeffery Smith and Brenda K. Smith

Jill Steinberg, John R. Branson, Mason W. Wilson, Ormonde B. DeAllaume, Memphis, Tennessee, for the appellee, Methodist Healthcare - Memphis Hospitals

# OPINION

## I. FACTS & PROCEDURAL HISTORY

On August 24, 1999, Jeffery Smith was admitted to Methodist Hospital ("the Hospital")[1] for elective umbilical hernia repair under the care of his surgeon. General anesthesia was obtained after a difficult esophageal intubation. The surgery itself was unremarkable, and Mr. Smith was discharged from the Hospital that same day. Two days later, Mr. Smith returned to the emergency room at the Hospital with respiratory distress, swelling of his pharnyx, and an infection. He underwent an emergency tracheotomy and another surgery and was hospitalized an additional sixteen days.

In August 2000, Mr. Smith and his wife, Brenda Smith (collectively, "Plaintiffs") filed this lawsuit against the Hospital and other defendants, alleging medical malpractice. Plaintiffs' claims against the other defendants were dismissed for various reasons, and the Hospital became the sole remaining defendant. Plaintiffs' complaint alleged that the Hospital was negligent in failing to provide Mr. Smith with proper postsurgical care, failing to inform him of the risks attendant to infection, failing to provide equipment free of infectious disease, failing to train and monitor the anesthesiologist and nurse anesthetist, and permitting an "incompetent" surgeon and anesthesiologist to utilize its facilities.

In June 2001, Plaintiffs responded to interrogatories and indicated that they intended to call one of Mr. Smith's treating physicians, Dr. Victoria Lim, as "their expert [at] trial." In December 2002, the Hospital filed a motion for summary judgment. The motion pointed out that Dr. Lim was the sole expert identified in the Plaintiffs' responses to interrogatories. The Hospital claimed that Dr. Lim's deposition testimony regarding causation was speculative, as she had stated that an earlier detection of Mr. Smith's condition "may have" prevented further complications, "hopefully," but "not necessarily." Thus, the Hospital argued that Plaintiffs could not establish causation through the testimony of their only expert, and therefore, summary judgment was appropriate.[2]

---

[1] Although the complaint in this case named the defendant as "Methodist Hospitals of Memphis," the brief submitted by the Hospital on appeal lists the defendant as "Methodist Healthcare - Memphis Hospitals, Incorrectly Named as Methodist Hospitals of Memphis." Aside from this reference, neither party raises an issue regarding the proper name of the defendant. We will refer to the defendant simply as "the Hospital."

[2] Alternatively, the Hospital argued that the Plaintiffs had failed to produce evidence regarding the applicable standard of care. The Hospital submitted an affidavit from a nurse who had treated Mr. Smith at the Hospital, who stated that she complied with the applicable standard of care. In response, the Plaintiffs

(continued...)

A consent order was entered on January 31, 2003, which stated that Plaintiffs were not in a position to oppose the Hospital's motion for summary judgment. Accordingly, the order provided, the Hospital's motion for summary judgment would be granted unless the Plaintiffs filed with the court an expert affidavit in opposition to the motion within thirty days.

Approximately thirty days later, Plaintiffs filed the affidavit of nurse Joyce Hudspeth. Relevant to the issue of causation, Nurse Hudspeth stated that Mr. Smith's subsequent surgeries "could have been avoided with early detection and medical management." Nurse Hudspeth later withdrew from serving as an expert witness for the Plaintiffs, but the Plaintiffs filed a substantially similar affidavit from another nurse in October 2003.

On December 1, 2003, the trial court entered an order granting summary judgment to the Hospital on the Plaintiffs' medical malpractice claim "because Plaintiffs did not present testimony of a medical doctor that any action or failure to act on the part of [the Hospital] made any difference in the medical outcome of the condition of the Plaintiff, Jeffrey Smith."

In that same order, the trial court granted the Plaintiffs leave to file a supplemental complaint against the Hospital, due to Plaintiffs' allegations that the Hospital had interfered with their contract with the nurse who initially served as their expert witness, Nurse Hudspeth. Thereafter, Plaintiffs filed a supplemental complaint alleging that an agent of the Hospital wrongfully contacted and pressured Nurse Hudspeth's employer after she provided an affidavit in this matter, which led Nurse Hudspeth to terminate her contract with the Plaintiffs.

In September 2010,[3] the Hospital filed a motion for summary judgment on the Plaintiffs' claim of tortious interference with contract, and it supported its motion with the deposition testimony of Nurse Hudspeth. She testified that when she provided her affidavit in this matter in March of 2003, she was employed as a regional supervisor of investigations with the Tennessee Department of Health, and in that capacity, she had investigated

[2](...continued)
submitted the affidavit of another nurse, who stated that if the Plaintiffs' allegations were true, then the applicable standard of care was not met. Thus, there were conflicting affidavits with regard to this issue. The trial court did not address the standard of care issue in its order granting summary judgment, and the Hospital does not argue on appeal that summary judgment should have been granted on that basis. Therefore, we will not discuss the issue further in this opinion.

[3] It is not clear from the record whether there was any activity in the case between 2003 and 2009. After the December 1, 2003 order granting summary judgment on the medical malpractice claim, the next document in the record was filed in 2009, and it relates to discovery.

complaints against doctors and nurses "at all the area hospitals." It was undisputed that approximately three weeks after Nurse Hudspeth provided her expert affidavit in this case, the Hospital's assistant general counsel contacted an attorney who served as the director of the Office of Investigations for Health Related Boards at the Department of Health, and who was also Nurse Hudspeth's supervisor, in order to suggest that a conflict of interest existed when the Department's investigators served as expert witnesses in medical malpractice lawsuits due to the information investigators obtain during investigations. Thereafter, the Department of Health changed its internal policy to prohibit its investigators from serving as expert witnesses in medical malpractice lawsuits. Nurse Hudspeth testified that she stopped serving as a legal consultant in *any* cases after she was instructed not to do so by her employer. However, Nurse Hudspeth testified that she had already withdrawn from serving as an expert in *this* case *before* her employer's policy change. She explained that after she reviewed the file in this case, she had a conversation with the Plaintiffs' attorney about her opinion, and she informed him at that time that she would not be willing to serve as an expert in this matter because she did not feel that the Plaintiffs had a strong case against the Hospital. Nurse Hudspeth testified that the Plaintiffs' attorney told her that he really needed an affidavit in order to keep the case moving forward because of an impending deadline, and he asked her to provide an affidavit "just to get him over the hump of that deadline," stating that he could then find another expert who might have a more favorable opinion. Although Nurse Hudspeth did provide the requested affidavit, she testified that her involvement in this case came to an end at that time, and that she informed the Plaintiffs' counsel that she would not continue to serve as an expert in this case. Nurse Hudspeth testified that it was *after* she withdrew from serving as an expert in this case when the Hospital's assistant general counsel contacted her employer, and she testified unequivocally that her withdrawal was not prompted by the call from the Hospital or by any instruction from her employer. She stated, "That was my decision."

In response to the motion for summary judgment, the Plaintiffs argued that a credibility issue existed regarding Nurse Hudspeth's testimony about the reason for her withdrawal. They pointed out that when Nurse Hudspeth was asked during her deposition if she stood by the expert affidavit she had provided in this case, she responded, "Well, yes." Plaintiffs argued that it was inconsistent for Nurse Hudspeth to say that she stood by her expert affidavit and, at the same time, to say that the case was "weak." Additionally, Plaintiffs claimed that Nurse Hudspeth had made an equivocal statement regarding the reason for her withdrawal during a 2003 teleconference with the judge. Finally, Plaintiffs pointed out that in May 2003, Nurse Hudspeth notified their attorney in writing that she could no longer serve as a legal consultant in any cases due to her employer's change in policy. In short, the Plaintiffs argued that a substantial credibility question existed regarding the true reason for Nurse Hudspeth's withdrawal, which could not be resolved by a motion for summary judgment. The Hospital filed a reply, arguing that the Plaintiffs' unsupported

assertion that Nurse Hudspeth was lying did not warrant a trial, as there was no evidence to suggest that Nurse Hudspeth was not credible.

In November 2010, the trial court granted the Hospital's motion for summary judgment on the issue of tortious interference with contract. The court found it undisputed that Nurse Hudspeth voluntarily withdrew as the Plaintiffs' expert witness, and that she did not withdraw as a result of the contact made by the Hospital with her employer. The Plaintiffs timely filed a notice of appeal.

## II.  ISSUES PRESENTED

On appeal, the Plaintiffs present the following issues, as we perceive them, for review:

1.    Whether the trial court erred in granting summary judgment to the Hospital on the medical malpractice claim; and
2.    Whether the trial court erred in granting summary judgment to the Hospital on the claim for tortious interference with contract.

For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

## III.  STANDARD OF REVIEW

A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Tenn. R. Civ. P. 56.04.** "When ascertaining whether a genuine dispute of material fact exists in a particular case, the courts must focus on (1) whether the evidence establishing the facts is admissible, (2) whether a factual dispute actually exists, and, if a factual dispute exists, (3) whether the factual dispute is material to the grounds of the summary judgment." **Green v. Green**, 293 S.W.3d 493, 513 (Tenn. 2009).

"The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." **Green**, 293 S.W.3d at 513 (citing *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Amos v. Metro. Gov't of Nashville & Davidson County*, 259 S.W.3d 705, 710 (Tenn. 2008)). "The moving party may make the required showing and therefore shift the burden of production to the nonmoving party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial." **Martin**, 271 S.W.3d at 83 (citing *Hannan v. Alltel*

*Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008)). In order to negate an essential element of the claim, "the moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party." *Id.* at 84 (citing *Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn. 2004)). "If the moving party is unable to make the required showing, then its motion for summary judgment will fail." *Id.* (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

If the moving party does make a properly supported motion, "[t]he non-moving party must then establish the existence of the essential elements of the claim." **McCarley v. West Quality Food Serv.**, 960 S.W.2d 585, 588 (Tenn. 1998)). The nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist. *Martin*, 271 S.W.3d at 84 (citing *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215). "The nonmoving party may satisfy its burden of production by: (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06." *Id.* (citing *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215 n.6). "The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party." *Id.* (citing *McCarley*, 960 S.W.2d at 588).

The resolution of a motion for summary judgment is a matter of law, which we review de novo with no presumption of correctness. *Id.* However, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Id.* (citing *Staples v. CBL Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

## IV.   DISCUSSION

### A.   *Medical Malpractice*

We note at the outset that because the trial court granted summary judgment on the medical malpractice claim in 2003, the Hospital argues that we should review the trial court's order granting summary judgment using the standard set forth in **Byrd v. Hall**, 847 S.W.2d 208 (Tenn. 1993), which, it claims, is different than the current summary judgment standard described in **Hannan v. Alltel Publ'g Co.**, 270 S.W.3d 1 (Tenn. 2008). The Hospital claims that "[u]nder **Byrd v. Hall**, summary judgment is appropriate when the non-moving party, after adequate time for discovery, fails to come forth with evidence that would allow a reasonable jury to return a verdict in his or her favor." Essentially, the Hospital is arguing

that it was entitled to use the "put up or shut up" approach to summary judgment because, according to the Hospital, that method was authorized under ***Byrd v. Hall***. Despite the Hospital's protestation to the contrary, our Supreme Court has clearly stated that it was not.

In ***Hannan***, the Supreme Court emphasized, "This Court did not adopt a 'put up or shut up' approach to burden-shifting in ***Byrd*** or in subsequent cases." 270 S.W.3d at 6. The Court acknowledged that after ***Byrd***, there was "some confusion among Tennessee courts as to the proof required for the moving party to meet its burden of production." ***Id.*** at 5. In fact, as noted in Justice Koch's dissent, the trial courts and the Court of Appeals had repeatedly interpreted the summary judgment standard to allow a moving party to satisfy its burden of production by demonstrating that the nonmoving party's evidence was insufficient to establish an essential element of the nonmoving party's claim. ***Id.*** at 16. Nevertheless, the Supreme Court insisted in ***Hannan*** that it had never adopted the "put up or shut up" method of burden-shifting, and therefore, the Court explained, it is not enough for the moving party to demonstrate that the nonmoving party's evidence, at the summary judgment stage, is insufficient. ***Id.*** Instead, the moving party may shift the burden of production to the nonmoving party by showing that the nonmoving party *cannot establish* an essential element of the claim at trial. ***Id.***

In sum, the Supreme Court has stated that ***Hannan*** was a "clarification" of Tennessee summary judgment law. ***Gossett v. Tractor Supply Co., Inc.***, 320 S.W.3d 777, 782 (Tenn. 2010). The summary judgment standard that the Hospital asks us to apply may have been utilized in previous Court of Appeals opinions, but according to ***Hannan***, it was never adopted by the Supreme Court, in ***Byrd*** or in subsequent cases. As a result, we find no merit in the Hospital's contention that we should apply ***Byrd*** to this case rather than ***Hannan***.[4] *See also **Akladyous v. Gtech Corp.***, No. M2008-00665-COA-R3-CV, 2009 WL 856667, at *2 (Tenn. Ct. App. Mar. 31, 2009) (noting that the Court would apply ***Hannan*** even though the case was decided by the trial court and briefed before the Court of Appeals prior to the ***Hannan*** decision).

Now, turning to the facts of this case, we have the Hospital's motion for summary judgment in which it contended that the Plaintiffs had "no competent medical evidence" as to the required elements of their medical malpractice claim.[5] As support for this assertion,

---

[4] We note that the Hospital contends that the outcome of this case would be the same under either ***Byrd*** or ***Hannan***.

[5] A patient filing a medical malpractice action has the burden of proving:

(1) The recognized standard of acceptable professional practice in the profession and the

(continued...)

the Hospital pointed out that the only expert identified by the Plaintiffs in their interrogatory responses was Dr. Lim. The Hospital claimed that Dr. Lim's testimony regarding causation was speculative and insufficient to establish causation to a reasonable degree of medical certainty.[6] The Hospital argued, "Because causation is an essential element in plaintiffs' case, and must be stated by an expert to be a probability, Methodist is entitled to judgment as a matter of law." The trial court granted the motion for summary judgment "because Plaintiffs failed to present testimony of a medical doctor stating to a reasonable degree of medical certainty, that any action or inaction on the part of [the Hospital] caused any difference in the medical outcome of the Plaintiff, Jeffrey Smith." We conclude that this was error.

"Summary judgment may be appropriate for the moving party who relies upon evidence from the nonmoving party, but only if that evidence affirmatively negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan*, 270 S.W.3d at 10. "It is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial." *Id.* at 8. Here, the Hospital claims that "Dr. Lim's testimony negates Plaintiffs' causation element of their medical malpractice claim by demonstrating that the cause of Plaintiffs' injuries is speculative." However, we find that the proffered deposition testimony of Dr. Lim did not *negate* the element of causation. She did not affirmatively testify that Mr. Smith's additional surgeries and complications were *not* caused by any action or inaction on the part of the Hospital or its agents. Had she done so, this would have negated the Plaintiffs' allegations to the

---

[5](...continued)
specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a). Subject to the "common knowledge" exception, which is inapplicable in this case, plaintiffs must establish each of these three statutory elements of their claim by competent expert testimony. *Shipley v. Williams*, 350 S.W.3d 527, 537 (Tenn. 2011).

[6] "[P]roof of causation equating to a 'possibility,' a 'might have,' 'may have,' 'could have,' is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case. Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993) (citing *White v. Methodist Hosp. South*, 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992)).

contrary. Instead, Dr. Lim testified that an earlier detection of Mr. Smith's condition "may have" prevented further complications, "hopefully," but "not necessarily." This evidence simply casts doubt upon the Plaintiffs' ability to prove causation at trial. The situation is analogous to the one in **Madison v. Love**, No. E2000-01692-COA-RM-CV, 2000 WL 1036362 (Tenn. Ct. App. July 28, 2000), a wrongful death case, where the defendant was granted summary judgment based upon the fact that the pathologist who performed an autopsy on the decedent stated that he "did not know what caused [the decedent's] death." The Court of Appeals explained that this evidence did not *negate* the element of causation:

> While Dr. McCormick's affidavit – and hence his presumed testimony – may be a serious impediment to the successful pursuit of this claim at trial, that is not the issue before us. Material supporting a motion for summary judgment must do more than "nip at the heels" of an essential element of a cause of action; it must *negate* that element. While it is clear that Dr. McCormick's affidavit casts doubt upon the plaintiff's ability to prove causation, that affidavit does not do enough. It does not *negate* the plaintiff's claim of causation in a way that would trigger the plaintiff's burden to produce countervailing material. In order to negate the element of causation, the defendants would have had to present admissible competent testimony that the defendants' failure to render aid did not cause or contribute to the death of the plaintiff's decedent. The affidavit, with its cause-of-death-is-unknown language is not the same.

*Id.* at *2. In sum, a "showing that a party may not yet, at the summary judgment stage, be able to prove an element of the case does not mean that an element has been negated or that proof of the element will be missing at the time of trial." **Dykes v. City of Oneida**, No. E2009-00717-COA-R3-CV, 2010 WL 681375, at *5 (Tenn. Ct. App. Feb. 26, 2010) (explaining that a doctor's testimony that he did not know whether police officers' failure to summon medical assistance was a factor in the victim's death did not *negate* the element of causation, because the testimony did not amount to an opinion that the officers' failure to act did *not* play a role in the death).

We note that under **Hannan**'s second method of burden shifting, the moving party may demonstrate that "the nonmoving party cannot prove an essential element of the claim at trial." 270 S.W.3d at 10. However, Dr. Lim's testimony fails to demonstrate that the Plaintiffs cannot prove causation at trial. The Hospital refers to Dr. Lim as the Plaintiffs' "designated medical expert," and the Plaintiffs' responses to interrogatories only identified Dr. Lim when asked to identify experts they intended to call at trial, but there is nothing in the record to suggest that the Plaintiffs could not have retained another expert prior to trial. There is no mention in the record of a scheduling order or deadline for disclosing expert

witnesses, and there appears to be nothing that would have prevented the Plaintiffs from supplementing their discovery responses to identify additional experts prior to trial.[7] Without such a limitation on the Plaintiffs' ability to retain another expert, the Hospital failed to demonstrate that the Plaintiffs cannot prove an essential element of their case at trial. They simply demonstrated that the Plaintiff could not establish an essential element of their case *with that expert testimony*. *See **Hannan***, 270 S.W.3d at 19-20 (J. Koch, dissenting).

Because the Hospital failed to affirmatively negate an essential element of the Plaintiffs' claim or show that the Plaintiffs could not prove an essential element of their claim at trial, the motion for summary judgment should have been denied, and the burden never shifted to the Plaintiffs to come forward with a causation expert. Thus, it is immaterial that the Plaintiffs only responded with the affidavit of a nurse rather than testimony from a medical doctor. The trial court's order granting summary judgment to the Hospital on the medical malpractice claim is accordingly reversed, and this matter is remanded for further proceedings consistent with this opinion.

### B.     *Tortious Interference with Contract*

Now, we must consider the motion for summary judgment filed by the Hospital with regard to the Plaintiffs' claim for tortious interference with their contract with Nurse Hudspeth. To recap, the basis of the Plaintiffs' claim was that Nurse Hudspeth would not have terminated her expert witness contract with the Plaintiffs but for the Hospital's contact with her employer. The Hospital filed a motion for summary judgment, claiming that it did not cause Nurse Hudspeth to withdraw from the case.[8] The Hospital did not dispute that its assistant general counsel contacted Nurse Hudspeth's employer, the Tennessee Department of Health, approximately three weeks after she provided her expert affidavit for the Plaintiffs. However, the Hospital pointed to Nurse Hudspeth's deposition testimony that she had already informed the Plaintiffs' counsel, when she provided the expert affidavit, that she would no

---

[7] The Hospital does not argue that the January 31, 2003 consent order, requiring the Plaintiffs to file "an expert affidavit" in response to the summary judgment motion within thirty days, would prohibit the Plaintiffs from obtaining additional experts after they filed the aforementioned affidavit. In fact, the Plaintiffs did file an affidavit from an additional nurse in October 2003. Moreover, a motion filed by the Hospital in the trial court stated that it was undisputed that "Plaintiffs were allowed from March through November of 2003 to put on whatever proof they desired" before summary judgment was entered on December 1, 2003.

[8] In order to establish a cause of action for unlawful inducement of a breach of contract, "a plaintiff must prove that there was a legal contract, of which the wrongdoer was aware, that the wrongdoer maliciously intended to induce a breach, and that *as a proximate result of the wrongdoer's actions*, a breach occurred that resulted in damages to the plaintiff." ***Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.***, 876 S.W.2d 818, 822-23 (Tenn. 1994) (emphasis added).

-10-

longer serve as an expert in this matter because she felt that the case against the Hospital was weak. Nurse Hudspeth testified that it was *after* she withdrew as Plaintiffs' expert in this case that the Hospital contacted her employer, and she testified unequivocally that her withdrawal was not prompted by the call from the Hospital or by any instruction from her employer. We conclude that this testimony negated an essential element of the Plaintiffs' claim, *i.e.*, causation, and therefore the burden shifted to the Plaintiffs to produce evidence of specific facts establishing that genuine issues of material fact existed. ***Martin***, 271 S.W.3d at 84. In response to the motion for summary judgment, the Plaintiffs questioned Nurse Hudspeth's credibility and suggested that she was untruthful regarding the reason for her withdrawal. The specific facts produced by Plaintiffs in support of their assertion were: (1) Nurse Hudspeth testified that she stood by her expert affidavit; (2) Nurse Hudspeth wrote a letter to Plaintiffs' counsel regarding her employer's change in policy in May 2003; and (3) Nurse Hudspeth allegedly made an equivocal statement regarding the reason for her withdrawal during a teleconference with the judge. We will examine each of these facts in turn in order to determine whether the Plaintiffs established a genuine issue of material fact.

The first evidence to which the Plaintiffs pointed was Nurse Hudspeth's deposition testimony that she continued to "stand by" her expert affidavit. Plaintiffs basically argued that this statement means that Nurse Hudspeth was lying when she said she felt the case was weak. However, when the Nurse Hudspeth's statement is considered in context, it does not support this assertion. The statement at issue was made in the context of Plaintiffs' counsel asking Nurse Hudspeth if her personal opinion about the case being weak means that the statements she made in her expert affidavit were untrue, and Nurse Hudspeth responded, "I don't think so." Plaintiffs' counsel asked if she continued to "stand by" her affidavit, and Nurse Hudspeth responded, "Well, yes." However, she also explained that Plaintiffs' counsel pressured her into providing the affidavit because of his impending deadline, and that she worded the affidavit very carefully to include such phrases as, "if [the Plaintiffs'] allegations are true," and she "tried to construct it in such a way that [she] was not committing [her]self to a conclusion that anything had occurred." Considering Nurse Hudspeth's statement about "standing by" her affidavit in context, we find that it does not suggest that she is lying about withdrawing because the case was weak.

Next, the Plaintiffs point to a May 20, 2003 letter from Nurse Hudspeth to the Plaintiffs' counsel which states, "This letter is to notify you that effective immediately, I will no longer be able to assist you with any legal matters related to malpractice or negligence claims." The letter goes on to explain that the Department of Health had changed its policy to prohibit its investigators from serving as experts in medical malpractice cases. Nurse Hudspeth went on to apologize for any inconvenience, and she stated that the situation was "entirely out of [her] control." In response to the Hospital's motion for summary judgment, the Plaintiffs seemed to suggest that this May 20, 2003 letter proves that Nurse Hudspeth did

not withdraw from the case until after the Department of Health's policy change. However, considering the other evidence in the record, we again conclude that this letter is entirely consistent with Nurse Hudspeth's testimony that she withdrew from the case in March 2003 because she felt the case was weak. Nurse Hudspeth testified that it was approximately one to two months after she withdrew from serving as an expert in this case when her supervisor informed her that she could no longer serve as an expert in medical malpractice cases. She testified that after her employer changed its policy, she "immediately sat down and drafted a letter to all of the attorneys that I was working with at the time to inform them that I would no longer be serving in that capacity." Nurse Hudspeth's May 2003 letter stated that she would no longer be able to assist Plaintiffs' counsel with "any legal matters related to malpractice or negligence claims," and it did not specifically mention the case at bar. However, she testified that she had already withdrawn from serving as an expert *in this case* by informing Plaintiffs' counsel of that decision in March 2003, and the Plaintiffs' produced no evidence to the contrary. As such, we find that the May 2003 letter is consistent with Nurse Hudspeth's deposition testimony, and it does not suggest that she is lying about when she withdrew from the case at bar.

Finally, the Plaintiffs claimed that Nurse Hudspeth made an equivocal statement about why she withdrew during a teleconference with the trial judge in July 2003. There is no transcript of the conversation, but during Nurse Hudspeth's deposition in 2010, she testified about it as follows:

> Q. Did you have any further involvement after you signed the affidavit in this case?
> A. No. Well, I take that back. I had got a phone call from Judge Kay Robilio. I'm assuming it was on the day of the hearing. She called to ask me some questions about the affidavit.
> Q. Okay. Can you describe that -- the substance of that conversation with Judge Robilio for me?
> A. Well, I don't have verbatim recall.
> Q. Sure. No. I understand. It's been a while.
> A. It has been a long time. But the gist of it was she wanted to know my opinion about the case and the affidavit that I had submitted. And basically, I had to tell her, you know, that Mr. Anderson, you know, had sort of put some pressure on me to do that. And I felt badly, you know, that I couldn't help these people. But in the way in which I constructed the affidavit, I tried to construct it in such a way that I was not committing myself to a conclusion that anything had occurred — you know, may have been true. Because I put in there that if allegations were true, then it would be a violation of the nurse practice act - not the

-12-

act, but rather nursing standards.

Q. Right. And I don't want to get into all the details about the affidavit or anything like that.

A. I understand. I don't know where to go.

On cross-examination, Plaintiffs' counsel then questioned Nurse Hudspeth about the conversation as follows:

Q. Do you recall Judge Robilio inquiring as to what prompted your withdrawal from this case?

A. I don't remember that, no.

Q. Do you recall telling Judge Robilio that you could no longer serve in this case?

A. I think I did, yes.

*Q. And do you recall telling Judge Robilio that contact had been made with your employer such that you could no longer serve in this case?*

*A. You know, I don't remember. It's possible.*

(Emphasis added). Once again, viewing the testimony as a whole, we find no genuine issue of material fact regarding when and why Nurse Hudspeth withdrew from this case. Significantly, the Plaintiffs did not present any evidence to contradict Nurse Hudpseth's testimony that she informed Plaintiffs' counsel when she provided the expert affidavit in March 2003 that she would no longer serve as an expert in this case. It is also undisputed that she had no further involvement in this case thereafter. During the conference call with the trial judge, Nurse Hudspeth explained that Plaintiffs' counsel had pressured her into providing an expert affidavit before she withdrew from the case. The conference call took place in July 2003, after the Department of Health changed its policy, and Nurse Hudspeth acknowledged that she may have informed the trial judge about the recent change in policy which, at that point, would have prevented her from serving as an expert in the case regardless of her opinion as to its strength. However, this statement does not contradict Nurse Hudspeth's repeated statements that she withdrew from serving as an expert in this case in March 2003, before any contact between the Hospital and her employer, because she felt the case was weak.

"A disputed fact presents a genuine issue if 'a reasonable jury could legitimately resolve that fact in favor of one side or the other.'" *Martin*, 271 S.W.3d at 84 (quoting *Byrd*, 847 S.W.2d at 215). In other words, "[i]f reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists." *Green*, 293 S.W.3d at 514. In the case before us, we conclude that the evidence and the inferences *reasonably* drawn from the evidence permit but one conclusion, that Nurse Hudspeth

voluntarily withdrew from serving as an expert in March 2003, and not as a result of any action on the part of the Hospital. Finding no genuine issue of material fact regarding the reason for Nurse Hudspeth's withdrawal, we affirm the trial court's decision to grant summary judgment to the Hospital on the issue of tortious interference with contract.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court in part, and we reverse in part and remand for further proceedings. Costs of this appeal are taxed equally to the appellants, Jeffrey Smith and Brenda Smith, and their surety, and to the appellee, Methodist Healthcare-Memphis Hospitals, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.