# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### August 14, 2012 Session

## GEORGE WOODSON and FLORA WOODSON v. MEG CAPITAL MANAGEMENT, INC., ET AL.

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT00465809      Jerry Stokes, Judge**

---

**No. W2011-02513-COA-R3-CV - Filed September 21, 2012**

---

Plaintiff was seriously injured during a dog attack by his neighbors' two dogs. Plaintiff sued, among others, the neighbors' landlord and an employee of the landlord. The trial court granted summary judgment to the defendants, determining that although the defendants retained sufficient control over the leased property, they lacked notice or knowledge of the dogs' vicious propensities. We find a question of fact exists regarding defendants' notice or knowledge of the dogs' vicious propensities. We affirm in part and reverse in part and we remand for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Stephen C. Barton, Edd Peyton, LaKeisha Sisco-Beck, Memphis, Tennessee, for the appellants, George Woodson and Flora Woodson

Richard Sorin, R. Scott McCullough, Memphis, Tennessee, for the appellee, MEG Capital Management, Inc. and Dale Green

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

George Woodson was seriously injured in a Pit Bull dog attack that occurred on or near Fiber Road in Memphis on May 20, 2009. Then-seventy-two year old Mr. Woodson was allegedly returning home from a walk when he was attacked by two dogs owned by his neighbors, Latasha Cobb and Stanley Bell, after the dogs somehow escaped the fenced backyard in which they were typically contained. As a result of the attack, Mr. Woodson was hospitalized for fourteen days, underwent five surgeries, and incurred medical expenses of $211,758.25.[1]

On October 1, 2009, Mr. Woodson and his wife, Flora Woodson, (collectively "Plaintiffs") sued various defendants[2] including MEG Capital Management, Inc., ("MEG") which leased its 1203 Fiber Road residence to Cobb and Bell, and MEG Property Manager Dale Green. MEG and Dale Green ("Defendants") filed a motion for summary judgment and a memorandum of law in support thereof, arguing that the elements of a claim against them had been affirmatively negated and/or could not be proven. Specifically, Defendants contended that they lacked knowledge or notice of the dogs' vicious propensities and that they lacked control over the leased premises to require Cobb and Bell to remove or to restrain the dogs. The trial court granted Defendants' motion finding that Defendants possessed control over the premises, but that they lacked notice of the dogs' vicious propensities. Plaintiffs timely appealed.

## II. ISSUE PRESENTED

On appeal, Plaintiff asks this Court to consider whether the trial court erred in granting summary judgment to Defendants. For the following reasons, we affirm in part and reverse in part and we remand for further proceedings.

---

[1] Mr. Woodson's medical expenses are undisputed for purposes of summary judgment.

[2] Plaintiffs also sued the tenant dog owners Latasha Cobb and Stanley Bell and Green Realty Company, which facilitated MEG's purchase of the 1203 Fiber Road property. Ultimately, default judgments were entered against these defendants.

### III. STANDARD OF REVIEW

A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Tenn. R. Civ. P. 56.04.** "The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." *Green v. Green,* 293 S.W.3d 493, 513 (Tenn. 2009) (citing *Martin v. Norfolk S. Ry.,* 271 S.W.3d 76, 83 (Tenn. 2008); *Amos v. Metro. Gov't of Nashville & Davidson County,* 259 S.W.3d 705, 710 (Tenn. 2008)).

"A moving party who seeks to shift the burden of production to the nonmoving party who bears the burden of proof at trial must either: (1) affirmatively negate an essential element of the nonmoving party's claim; or (2) show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 9 (Tenn. 2008)[3] (footnote omitted). "It is not enough for the moving party to challenge the nonmoving party to 'put up or shut up' or even to cast doubt on a party's ability to prove an element at trial." *Id.* at 8.[4] If the moving party makes a properly supported motion, the burden of production shifts to the nonmoving party to establish the existence of a genuine issue of material fact. *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993).

The resolution of a motion for summary judgment is a matter of law, which we review de novo with no presumption of correctness. *Martin,* 271 S.W.3d at 84. However, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Id.* (citing *Staples v. CBL & Assocs., Inc.,* 15 S.W.3d 83, 89 (Tenn. 2000)).

---

[3]Recently, the Tennessee General Assembly enacted a law that legislatively reversed the Tennessee Supreme Court's holding in *Hannan*. *See* Tenn. Code Ann. § 20-16-101. However, the statute applies only to cases filed on or after July 1, 2011. Thus, in this appeal, we apply the summary judgment standard set forth in *Hannan*.

[4]In this case, it appears that the trial court employed an incorrect summary judgment standard as its Order Granting Summary Judgment states that summary judgment in favor of Defendants is appropriate because Plaintiffs: "submitt[ed] affirmative evidence that negates essential elements of Plaintiffs' claim; and (2) *demonstrat[ed] to the Court that the Plaintiffs' evidence is insufficient to establish an essential element of Plaintiffs' claim*." (emphasis added).

# IV. DISCUSSION

To hold a landlord liable for injury to a third person by a dog owned and kept by a tenant, two prongs must be proven with respect to the landlord: "(1) knowledge or notice of the vicious propensity of the dog, and (2) sufficient retained control over the leased premises to afford an opportunity for the landlord to require the tenant to remove the dog or safely restrain it."[5] *Gilliland ex rel. Gilliland v. Pinkley*, No. W2009-00982-COA-R3-CV, 2001 WL 557985, at *3 (Tenn. Ct. App. May 23, 2001) (citations omitted). On appeal, Plaintiffs argue that the trial court erred in finding the Defendants lacked knowledge or notice of the dogs' vicious propensities. Defendants, of course, contend that they lacked knowledge or notice, but they also challenge the trial court's finding of control.

## A. Knowledge or Notice

On appeal, Plaintiffs argue that a genuine issue of material fact exists as to whether Defendants had knowledge or notice of the vicious propensities of the dogs. We begin our examination of this issue by considering the lengthy deposition testimony elicited.

Reginald Green is the Vice President of MEG, which operates out of Inglewood, California, and which owns "[a] dozen or so" properties in Memphis including 1203 Fiber Road, which was leased to Latasha Cobb and Stanley Bell. Reginald Green resides in California, but he travels to Memphis three to four times per year to inspect MEG's Memphis properties. He has inspected the 1203 Fiber Road property "dozens" of times. He claimed that prior to the attack on Mr. Woodson, he was unaware that Latasha Cobb and Stanley Bell kept Pit Bull dogs on the property. During his various inspections, he never saw the dogs; he only "heard barking coming from the back" and he was unsure whether the noise originated from 1203 Fiber Road or a neighboring property.

Reginald Green testified that as the owner of the 1203 Fiber Road property, MEG is responsible for the property's care and maintenance–"hav[ing] everything functional and operational"–including the fence around the backyard of the property. He agreed that his brother, MEG Property Manager Dale Green as well as his nephew, MEG "maintenance guy" Jamison Cooper are authorized to make "day-to-day decisions regarding any maintenance required on any MEG property in Memphis."

---

[5]We reject Plaintiffs' apparent alternative argument that landlord liability for injuries inflicted by a tenant's dog requires a lesser showing of failure to exercise reasonable care.

Reginald Green testified that he inspected the 1203 Fiber Road property's backyard fence after the attack on Mr. Woodson, and he stated that he found "that the fence was in working condition." However, he acknowledged that he could not recall whether such inspection was made prior to a summer 2009 storm–following the May 2009 attack–which necessitated repairs to the fence.[6] Contradictorily, he then stated that his claim that the fence "was in working condition" was based upon his inspection of it prior to Latasha Cobb ever moving in to the property–well before the attack. He concluded that he was unsure whether *any* repairs were made to the fence following MEG's acquisition of such, but prior to the dogs' attack on Mr. Woodson.

MEG Property Manager Dale Green testified that he was charged with, among other responsibilities, visiting 1203 Fiber Road to collect rent from tenants Cobb and Bell. Because of these visits, Dale Green saw the dogs at issue "[r]oughly once a month[,]" and during the tenancy of Cobb and Bell, he saw the dogs "at least maybe ten times[.]"[7] On his collection visits, he stated that two dogs, of a breed unknown to him, were visible in the backyard, but that "[the dogs] [weren't] doing a whole lot of barking when we pulled up." However, he also stated that the dogs "would bark when we pulled up; but after a while, they would just settle down." Regarding the dogs' nature Dale Green testified as follows:

> Q: Did you ever see the dogs act aggressive or menacing?
>
> A: No, sir.
>
> Q: Other than the barking?
>
> A: That's about it.

During these visits, he never saw tenants Cobb or Bell in the backyard with the dogs and he never discussed the dogs with them or with any neighbors. He always saw the dogs behind the fence. He "[couldn't] recall if [the dogs] were chained or not. [He just] assumed they were." He never saw the dogs trying to escape the fence, nor did he ever see them out in the street or in the front yard. He could not recall, however, whether he ever saw the gate to the backyard fence open.

---

[6]At the hearing on Defendants' motion for summary judgment, Defendants' counsel acknowledged that the condition of the fence at the time of the attack is "in dispute."

[7]Dale Green testified that Cobb and Bell rented the 1203 Fiber Road property for approximately sixteen months.

Dale Green described the dogs as follows: "They wasn't just like no big, big dogs [sic]." He never tried to pet them, but he maintained that he would not have been afraid to do so. However, at a later point in his deposition, he stated that he was unsure whether he would have been afraid to put his hand through the backyard fence and he could not recall whether or not he had ever been in the backyard while the dogs were present. He testified to his surprise upon learning that the dogs had attacked Mr. Woodson.

Dale Green, as an MEG employee, was also responsible for maintaining the backyard fence. He testified that he, along with Jamison Cooper, made repairs to the backyard fence in 2006 at the request of the then-tenant. He stated that after the 2006 repairs, he made no repairs to the fence until after the summer 2009 storm. However, when questioned with photographs depicting the addition of metal "grates" to the fence bottom, Dale Green testified that "if it's there" he was the person who "put it there[.]" He could not recall, though, why such grates had been installed.

MEG "maintenance guy" Jamison Cooper also testified by deposition. Jamison Cooper accompanied Dale Green on the monthly rent collection visits, as he provided transportation for Mr. Green. Thus, Jamison Cooper visited the 1203 Fiber Road property monthly, if not more frequently, to make repairs. He stated that if Cobb and Bell had a problem on the property that he and Dale Green were responsible for resolving it. Moreover, if he or Dale Green discovered a problem themselves, they were, likewise, responsible for correcting it.

Jamison Cooper testified that he never saw the dogs except on rent collection visits. He testified regarding those visits, and the dogs' nature, as follows:

Q: Did you ever see the dogs inside the house?
A: No.
Q: They were always behind the fence?
A: Behind the fence.
. . . .
Q: And would the dogs bark when y'all pulled up in the pickup truck or the truck?
A: Yes.
. . . .

Q: And would they bark when you would walk up to the door?

A: Yes.

Q: And did you ever walk over and attempt to pet the dogs?

A: No.

Q: Did you ever see them running around in the back yard?

A: Yes.

Q: Up and down the fence?

A: Yes.

Q: And that would be when you were walking up to the door to get the rent?

A: Yes.

Q: And they would be barking?

A: Yes.

. . . .

Q: But they would be barking and acting up as you would approach the door, correct?

A: Correct.

. . . .

Q: Other than the dogs barking when you approached the door of the house, did you ever see them acting aggressively?

A: No.

Q: But they were acting aggressively then, correct?

A: No, I never noticed them acting aggressively?

Q: Well, they were barking?

A: Just regular barking.

Q: As you approached the door?

A: Right.

. . . .

Q: Had you ever seen the dogs trying to get over the fence at any other time?

A: No.

Q: Did you ever see the dogs trying to get under the fence?

A: No.

Q: Through the fence at any point?

A: No.

. . . .

Q: But you weren't concerned about - - you, as an employee of MEG, you weren't concerned about the fact that there were dogs maintained behind that fence?

A: To keep the dogs from getting out?

Q: Yes sir. You were concerned about that, correct?

A: To keep the dogs from getting out?

Q: Yes, sir.

A: Yeah.

Q: And you were concerned about that because you wouldn't want the dogs to get out, correct?

A: Correct.

Q: Because they might hurt somebody just like they actually did in this case, right?

. . .

A: Correct.

Jamison Cooper also testified regarding the need to restrain the dogs while working on the fence:

Q: Did you ever go into the backyard while the dogs were there?

A: No.

Q: What about if you had to work on the fence, what would happen to the dogs?

A: They would have to be chained up, secured.

. . . .

Q: But on those occasions when you and/or Mr. [Dale] Green would work on the fence, were the dogs chained up in the backyard?

A: Yes.

Q: And would you request that they be chained up?

-8-

A: Yes.

Q: That's because you were concerned about them when you were working on the fence, correct?

A: Concerned about my safety.

Q: And that's because of how they would act when you would go up to the door, correct?

A: Just in general, whether they barked or not when I went to the door, I was just concerned about my safety, to make sure they were chained up.

Q: And you were concerned about these dogs, if you were working on the fence, that they be chained up, correct?

A: My safety, that they would be chained up, concerned about my safety.

. . . .

Q: You testified that when y'all would work on the fence, that the dogs would be chained up. Would y'all say "Please chain up the dogs, we're going to work on the fence"? Would they do that automatically or how did that come about?

A: I would tell them to chain up the dogs so we could work on the fence.

Q: Secure the dogs so that you would be safe?

A: Yes.

. . . .

Q: Was Mr. [Dale] Green concerned about the dogs, as you were?

A: Concerned for his safety.

Q: Yes, was he concerned about that?

A: His safety.

Q: Yes, sir?

A: Yes.

Q: And would you have approached the yard to work on the fence if the dogs had not been chained up?

A: If they weren't chained up, I never approached the – never went toward the backyard.

Q: Would you have if you saw they weren't chained up?

A: No.

Q: And why is that?

-9-

A: Concerned for my safety.

. . . .

Q: [W]hen the dogs would be chained up while y'all were working on the fence, would they be chained up in the backyard or the front yard?

A: I don't recall.

However, at a later point in his deposition, Jamison Cooper testified that he was "confus[ed]" when responding to the previous line of questioning:

Q: Your lawyer . . . just told me that during the deposition you told him that there was some confusion about when you worked on the fences?

A: Correct.

Q: And what is that confusion?

A: The confusion is I thought you were asking the question of what if the dogs – what if I had worked on the fence where the dogs were secure when Mr. Bell and Ms. Cobb were staying there.

Q: So when I was asking all those questions about you working on the fence and where were the dogs and were the dogs chained up, that was all just what if?

A: Yes.

Q: Your testimony now is that none of that ever happened?

A: No, we didn't repair the fence when Ms. Cobb and Mr. Bell were staying there.

. . . .

Q: Did you ever work on the fence while the dogs were there?

A: No.

Q: So when you were saying "what if" you're saying if you had worked on the fences, that you would have wanted those dogs to be secured?

A: Correct.

Jamison Cooper acknowledged that whether the questions related to his *actual* repair of the fence or only to a *theoretical* repair, that his feelings about the dogs–and their need for restraint–remained unchanged. However, he also indicated that he would require restraint of

*any* dog–regardless of its size or behavior–before entering a fenced area where the dog was housed to make repairs.

Finally, Jamison Cooper testified regarding his repairs to the backyard fence at 1203 Fiber Road. He stated that he performed no fence repair between the 2006 work at the then-tenant's request and the 2009 summer storm. He could not recall whether he had periodically inspected the fence during Cobb's and Bell's tenancy, nor whether it was part of his job responsibilities to do so. However, he acknowledged that *if* he had inspected the fence and found it in need of repairs that it was part of his job responsibility to make the necessary repairs. He denied attaching the metal grates to the bottom portion of the fence and he claimed that he had never seen them before. He did not know whether the fence was in good condition at the time of the attack on Mr. Woodson.

Plaintiff George Woodson testified by deposition that he had walked and driven past 1203 Fiber Road prior to the date of the attack, but that he had never seen the dogs until the morning of the attack. His wife, Flora Woodson, similarly testified that prior to the attack she was unaware that dogs were living at 1203 Fiber Road and she had no recollection of dogs roaming the neighborhood. Neither Mr. nor Mrs. Woodson had personal information regarding the condition of the fence on the date of the attack.

Numerous photographs of the fence in question, indicating significant disrepair, were also admitted into evidence. However, the date on which a majority of the photos were taken could not be discerned. Thus, it is unclear whether most were taken prior to the summer 2009 storm which, according to Dale Green, "practically tore the fence up." Nevertheless, the photographs do depict the addition of metal grates to the bottom section of a portion of the fence and the few photographs known to have been made on the date of the attack, although somewhat blurry, indicate some level of disrepair.

Again, on appeal, Plaintiffs contend that a genuine issue of material fact exists as to whether Defendants had knowledge or notice of the vicious propensities of the dogs. Tennessee courts have discussed the "vicious propensity" concept in a number of cases.[8] In *Alex v. Armstrong*, 385 S.W.2d 110, 112-15 (Tenn. 1964), our Supreme Court declined to impute vicious propensity notice upon defendants whose large dog, while playing, knocked

---

[8]We reject Defendants' argument that only cases specifically addressing a *landlords'* liability–as opposed to an *owner's* liability–are applicable here. We find the technical status of the defendant irrelevant to the analysis of the "vicious propensity" standard.

down and injured a neighbor. The Court noted that "Courts generally hold that acts done by the dog that are dangerous from playfulness or mischievousness are to be considered, as well as acts of viciousness itself." *Id.* at 114. The reasoning behind this rule is that "'a vicious or dangerous disposition or propensity may consist of mere mischievousness or playfulness of the animal, which, because of its size or nature, might lead to injury, for it is the act of the animal, rather than its state of mind, which charges that owner or keeper with liability.'" *Id.* at 115 (quoting 4 Am.Jur.2d, Animals, Section 86). Despite the defendants' knowledge, however, that their dog had "chased [a neighbor] inside and started running up and down the fence barking," the Court found the evidence insufficient to charge notice. *Id.*

In *White v. Smith*, No. E2004-02467-COA-R3-CV, 2005 WL 1183151, at * (Tenn. Ct. App. May 19, 2005) Plaintiff was attacked by her neighbors' dog during a neighborhood walk. Plaintiff testified that on previous walks the dog had been contained within a fence and that "Otherwise, [she] wouldn't have been walking by there." *Id.* at *2. Plaintiff claimed that during her previous walks the dog would "run the fence . . . [and] [act] viciously, like it wanted to jump the fence and attack." *Id.* Another neighbor similarly testified that she had walked by the defendants' house and observed the dog "running the fence and just snapping at you." *Id.* at *3. She "said [to herself], that dog would hurt you if it gets out." *Id.* Although she had never complained to the defendants, she added that her now-deceased husband had made such complaints. *Id.* In considering the dog's vicious propensities, the trial court found that

> to a person walking down the street, having a dog fenced in barking at them repeatedly on every occasion, it's not unreasonable for that person to conclude that that dog is vicious with respect to them. And it would be hard to believe that an owner of the dog would not or should not have known of this particular propensity of the dog toward people, pedestrians, being where they have a right to be.

*Id.* at *5. This Court determined that the preponderance of the evidence did not weigh against such findings. *Id.* at *7.

In *Fletcher v. Richardson*, 603 S.W.2d 734 (Tenn. 1980), our Supreme Court considered a dog owner's liability for harm inflicted by his dog. The Court noted that the owner could only be held liable if he or she "knew, or under the circumstances should have known, of the dangerous disposition of the animal[.]" *Id.* at 735. In a footnote, the Court quoted the Restatement Second, of Torts, with approval:

-12-

Knowledge of dangerous propensities-scienter.  It is not necessary . . . that the possessor of the domestic animal know of its abnormally dangerous propensities; it is enough that he has reason to know of them.  Thus it is not necessary that he know that is has previously attacked human beings or animals or has done harm by being over-violent in play or by digging up vegetation.  A dog is not necessarily regarded as entitled to one bite.  It is enough that the possessor of the animal knows that it has on other occasions exhibited such a tendency to attack human beings or other animals or otherwise to do harm as should apprise him of its dangerous character.  Thus, the fact that a dog has to his knowledge unsuccessfully attempted to attack human beings or other animals is sufficient. . . . . Sufficient also is any form of ill temper displaying in the presence of animal or beast that would apprise a reasonable person that the animal if uncontrolled would make an attack.  It is not enough, however, that the possessor of the animal has reason to know that it has a propensity to do harm in one or more specific ways; it is necessary that he have reason to know of its propensity to do harm of the type that it inflicts.

*Id.* at 736 n.1 (quoting Restatement, Second, of Torts § comment g at 17-18 (1977)).

In the instant case, the trial court determined that Defendants lacked knowledge or notice of the dogs' vicious propensities based upon the following:

1. The dogs would bark and then settle down when MEG Capital Management, Inc. employees Dale Green and Jamison Cooper arrived to collect the monthly rent;

2.  None of the neighbors in the area of 1203 Fiber Road ever complained to MEG Capital Management, Inc. or Dale Green about the dogs;

3. Plaintiff George Woodson had walked by 1203 Fiber Road several times prior to the incident.  The first time George Woodson saw the dogs was on the day of the attack.

Respectfully, the test for landlord liability focuses upon the *landlord's* knowledge or notice of a dog's vicious propensity.  That neighbors did not complain about the dogs and that Mr. Woodson had no prior knowledge of their existence is not dispositive of the issue.  Instead, we find that the evidence thus far presented does not negate or foreclose a showing of notice or knowledge of vicious propensity.

It is true that MEG employees testified that they always saw the dogs contained within the backyard fence, that they never saw them attempting to escape, and that they were surprised to learn that the dogs had attacked Mr. Woodson. However, the MEG employees acknowledged that the dogs ran "[u]p and down the fence" when they visited to collect rent and that they "would be barking and acting up as [they] approached the door[.]" Although Jamison Cooper later "clarified" his testimony regarding requiring restraint of the dogs while repairing the fence, a reasonable juror could conclude–particularly in light of his status as an MEG employee and as a nephew of MEG Vice President Reginald Green–that such repairs did, in fact, occur, and that Jamison Cooper required the dogs be chained to promote his safety. Moreover, Jamison Cooper testified, without retraction, that he was concerned about keeping the dogs contained within the fence in order to prevent them from hurting someone as they did Mr. Woodson.

Similarly, Dale Green's deposition testimony could be construed as agreeing that the dogs acted "aggressive[ly] or menacing[ly]" when barking. In any event, we are not bound by his characterization of the dogs' conduct. Additionally, the photographs included within the record clearly depict the addition of reinforcing metal grates, which Dale Green testified, "if [they are] there" he was the person who "put [them] there[.]" Although he could not recall why they had been added, a reasonable juror certainly could conclude they were put in place to prevent and/or correct active escape attempts.

Certainly, there exists evidence in this case both supporting and opposing a finding of notice/knowledge of vicious propensity. At best, the testimony of the MEG employees proffered in this case reveals the employees' subjective beliefs that the dogs lacked vicious propensities. However, portions of their testimony–particularly given their interested status–as well as the photographic evidence produced, could lend support to a finding of notice/knowledge. Even if we assume that the "facts," e.g. the dogs' behaviors, are as stated by the MEG employees, we find there exists a dispute regarding the reasonable inferences to be drawn from the undisputed facts. ***See Brown v. Birman Managed Care, Inc.***, 42 S.W.3d 62, 66 (Tenn. 2001). In sum, we find that he evidence submitted thus far fails to affirmatively negate the notice/knowledge element of Plaintiffs' claim or to demonstrate that Plaintiffs will be unable to establish this element at trial, perhaps through additional evidence. ***See Hannan***, 270 S.W.3d at 9.

## B. Sufficient Retained Control

Having determined that a question of material fact exists as to whether Defendants had knowledge or notice of the vicious propensities of the dogs, we now address whether Defendants possessed "sufficient retained control" over the 1203 Fiber Road property to require the tenants to remove or safely restrain the dogs. *Gilliland*, 2001 WL 557985, at *3 (citations omitted).

As stated above, the trial court determined that Defendants possessed control over the leased premises so as to satisfy the second prong of landlord liability. On appeal, Defendants essentially contend that control was erroneously found because the written lease between MEG and the tenants did not expressly "grant MEG the authority to require the tenants to remove the two dogs or safely restrain them" even if MEG had knowledge or notice of the dogs' vicious propensities.

In purported advancement of their express-written-requirement proposition, Defendants cite several cases. First, they rely upon *Southern Bell Telephone and Telegraph Co. v. Yates*, 232 S.W.2d 796, 798-99 (Tenn. Ct. App. 1950) in which this Court considered the liability of a landlord for water damage caused by his tenant. Regarding control, the Court stated:

> the defendant must be regarded as entitled to the exclusive possession of the entire leased premises against the landlord and all others having no superior title; for a lessor retains no rights over the leased premises, except such as are reserved in clear and express terms. He has no right during the term to enter upon the premises even to make necessary repairs unless the tenant consents.

*Id.* (internal citations omitted).

Defendants also cite *Langford v. Darden*, No. M2004-00158-COA-R3-CV, 2005 WL 378774 (Tenn. Ct. App. Feb. 16, 2005), which addressed the liability of an absent landlord for an attack by a tenant's dog. In addressing whether the absent landlord "retained sufficient control" over the leased premises, we noted, "It is settled in law in this jurisdiction that '[a] tenant is entitled to the exclusive possession of the leased premises against the landlord for a landlord retains no rights over leased premises, except such as are reserved and clear in express terms.'" *Id.* at *2 (citing *Gilliland*, 2001 WL 557895, at *3). In finding the landlord lacked the requisite control, we noted the absence of a written lease between the landlord and the tenant.

Finally, Defendants cite *Gilliland v. Pinkley* in which we, again, considered the liability of a landlord for an attack by a tenant's dog. 2001 WL 557985. As in *Langford*, we noted that "there was no written lease between [tenant] and [landlord] and no authority of [landlord] to retain control over the leased premises[,]" and we stated that "Such is a requirement for liability of a landlord." *Id.* at *3. Thus, we affirmed the trial court's grant of summary judgment to the landlord, finding that the elements of a claim against the landlord could not be established. *Id.*

Here, MEG and tenants Latasha Cobb and Stanley Bell executed a "Lease of Rental Agreement" which provided in relevant part:

> I will maintain this property in as good a state as I find it, reasonable wear and tear expected. . . .
>
> In the event I fail to pay rent when due *or if I violate any other provision of the agreement*, or become insolvent or bankrupt, the landlord or his agent shall have the right, without demand or notice, immediately upon my breach of this agreement by me to place a "For Rent" sign on the premises.

(emphasis added).

Additionally, both MEG Vice President Reginald Green and MEG Property Manager Dale Green testified that because the lease was silent regarding pets, that MEG retained discretion to allow or disallow them. Moreover, in its Response to Plaintiffs' Additional Material Facts, MEG stated that "It is undisputed that MEG Capital Management, Inc. had the discretion on whether to allow a tenant to have a pet[,]" and that it "had the right to evict a tenant if they were engaging in dangerous and inappropriate activities."

From the evidence presented, MEG cannot reasonably argue that it lacked sufficient control over 1203 Fiber Road to require tenants Cobb and Bell to remove or restrain their dogs. The lease, itself, authorized eviction due to property damage–ostensibly including fence damage. And, by its own admission, MEG retained authority to allow or disallow the keeping of a pet, and to evict tenants based upon their engagement in "dangerous" or "inappropriate activities." Based upon the foregoing, we affirm the trial court's finding of control in this case.

## V. CONCLUSION

For the aforementioned reasons, we affirm in part and we reverse in part and we remand for further proceedings. Costs of this appeal are taxed to Appellees, MEG Capital Management, Inc. and Dale Green, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.